IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**LISA CRAWFORD**                                                                                    **PLAINTIFF**

v.                                                                    CASE NO.: __3:23-cv-140-TSL-MTP__

**VITALCORE HEALTH STRATEGIES, LLC; AND
MISSISSIPPI DEPARTMENT OF CORRECTIONS/
CENTRAL MISSISSIPPI CORRECTIONAL FACILITY**                             **DEFENDANTS**

**COMPLAINT**
**JURY TRIAL DEMANDED**

**COMES NOW** Plaintiff, Lisa Crawford, by and through counsel, Watson & Norris, PLLC, and files this action to recover damages against Defendant VitalCore Health Strategies, LLC; and Mississippi Department of Corrections/Central Mississippi Correctional Facility, for violations of her rights under 42 U.S.C § 1981 and Title VII of the Civil Rights Act of 1964. As more specifically set forth below, Plaintiff has been subjected to unlawful race discrimination and a hostile work environment. In support of this cause, the Plaintiff would show unto the Court the following facts to-wit:

**THE PARTIES**

1.     Plaintiff, Lisa Crawford, is an adult female citizen of Rankin County, Mississippi.

2.     Defendant, VitalCore Health Strategies, LLC, may be served with process by serving its registered agent: C T Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

3.     Defendant, Mississippi Department of Corrections/Central Mississippi Correctional Facility is a Mississippi state agency located in Pearl, Mississippi and is the recipient of federal funding. Defendant may be served with process through the

1

Mississippi Attorney General's Office: Lynn Fitch, Mississippi Attorney General, 550 High Street, Suite 1200, Jackson, Mississippi 39201.

## JURISDICTION AND VENUE

4. This Court has federal question jurisdiction and venue is proper in this Court.

5. This action arises under 42 U.S.C § 1981 and Title VII of the Civil Rights Act of 1964.

6. Plaintiff filed a Charge of Discrimination with the EEOC, on January 27, 2021, a true and correct copy of which is attached as Exhibit "A." On November 28, 2022, the EEOC issued a Dismissal and Notice of Right to Sue, a true and correct copy of which is attached as Exhibit "B." Plaintiff timely files this cause of action within ninety (90) days of receipt of her Dismissal and Notice of Right to Sue.

## STATEMENT OF FACTS

7. Plaintiff is a 42-year-old white female resident of Rankin County, Mississippi.

8. Plaintiff was hired on April 16, 2019, as a full-time Licensed Practical Nurse at Centurion Medical.

9. Centurion Medical was contracted with the Mississippi Department of Corrections Central Mississippi Correctional Facility (MDOC/CMCF) and that is the location where Plaintiff worked.

10. On October 4, 2020, Centurion was bought out by VitalCore Health Strategies, LLC (VC) and Plaintiff was hired by VC, but her job essentially remained the same as it had been previously.

11. Plaintiff was assigned to an area designated as "720".

12. For the entirety of her employment, Plaintiff has been the only white female working in that area.

13. Around June or July 2019, Officer Melissa Jenkins (black female) deliberately left Plaintiff locked in an area with a large group of inmates.

14. Plaintiff clearly communicated her desire for Officer Jenkins to unlock the door so she (Plaintiff) could leave the area, but Officer Jenkins deliberately ignored her.

15. Following that incident, Plaintiff filed a grievance against Officer Jenkins, due to her unprofessional and inappropriate behavior.

16. In apparent retaliation for her filing of the grievance against Officer Jenkins, as the latter half of 2019 went on, other black female officers, Sergeant (FNU) Bass, Lt. Paulette Franklin, and Officer Jenkins would often harass Plaintiff while she was administering medications to inmates.

17. They would speak in loud and hostile voices toward both the inmates and toward Plaintiff while she was engaged in the important and delicate process of ensuring that the correct medications were administered to the correct inmates.

18. This harassment made it very difficult for Plaintiff to focus on this task and increased the potential likelihood of a medication error occurring.

19. These same officers never treated black nurses in this manner.

20. There was a black male inmate, John Smith, who made many comments indicating his sexual preference for white women.

21. This inmate was very large and muscular and was serving two life sentences for capital murder.

22. It became increasingly evident that he was obsessed with Plaintiff.

23. On or around May 3, 2020, Mr. Smith approached Plaintiff and attempted to speak with her, but she rebuffed him and said she was there to use the restroom.

24. Plaintiff then went into the restroom.

25. When Plaintiff came out, Mr. Smith, who had been hiding in a storage closet, came out and rapidly moved toward her and invaded her space, making it difficult for Plaintiff to entirely exit the restroom.

26. Plaintiff took a step back and informed Mr. Smith that he was too close and needed to back up.

27. Mr. Smith then stated, "There are no officers going to see back here" and he went on to tell Plaintiff about allegations of her behavior and conduct that he had apparently heard from other inmates.

28. Plaintiff began to raise her voice in an effort to get the attention of other officers.

29. Eventually, Mr. Smith moved so that Plaintiff had space to get by and she seized the opportunity to push abruptly past the inmate and left the area.

30. Plaintiff then went straight to the Shift Commander's office to report the incident both verbally and with written documentation.

31. Because of the write up, Warden James Miller (black male) launched an investigation of the incident was launched on May 4, 2020.

32. Within the next day or two that followed, Lieutenant Franklin (black female) approached Plaintiff and asked about the incident with Inmate Smith.

33. Plaintiff responded, "Ma'am, I have already written my report and turned it in."

34. Plaintiff then attempted to leave but Lt. Franklin blocked her path and in a loud intimidating voice demanded to know to whom Plaintiff had given the report.

35. Plaintiff stated that she had turned in the report to Shift Command, but she refused to name the specific officer, as she suspected Lt. Franklin wanted to find and destroy it.

36. Additionally, several other black female officers began badgering Plaintiff and retaliating against her in various ways.

37. When Plaintiff confronted them about harassing her for writing up Mr. Smith, the officers insisted the inmate would never have done what she reported he did, i.e., they took the word of a convicted murderer over hers.

38. On May 4-5, 2020, Plaintiff complained to Warden Miller about how several of the black female officers were racially discriminating against her and retaliating against her (i.e., because of her write up of inmate John Smith).

39. Plaintiff further noted that these officers were tending to support the credibility of Mr. Smith over and above her (i.e., Plaintiff).

40. In response to Plaintiff's complaints about the racially motivated discrimination and retaliation of the black female officers against her (i.e., related to her write up of the incident with Mr. Smith), Warden Miller generated an email ordering all staff to refrain from speaking to Plaintiff or Mr. Smith about the incident and the subsequent investigation.

41. On May 7, 2020, the investigation was concluded, and Plaintiff was fully substantiated in her claims against Mr. Smith.

42. Inmate Smith was disciplined, and he was removed from the job to which he had been assigned.

43. Despite this outcome, Mr. Smith was still allowed to roam free about the compound and to where Plaintiff worked.

44. Routinely he yelled openly about his plan to "sue that white nurse and make her lose her license."

45. This behavior was not impeded in any way by the black female officers.

46. Moreover, some of the officers continued to harass Plaintiff.

47. Plaintiff heard from other inmates that Mr. Smith had written the state board of nursing and filed complaints against her.

48. On June 4, 2020, Plaintiff was performing her duty dispensing medication to inmates.

49. One inmate had some questions about his medication, and she was attempting to give him instructions related to it.

50. This activity is an essential part of her job description.

51. Lt. Franklin came in and loudly yelled, "Nurse, hurry it up and stop talking!"

52. Plaintiff explained that she was helping the inmate with his medications and that it was her job to do so.

53. Lt. Franklin responded by loudly stating, "I don't give a fuck what you're doing, I'm in charge! Move along!"

54. After several more similar exchanges, Plaintiff stated that she was not

going to be stopped from doing her job and that she was going to call her supervisor.

55. In response, Lt. Franklin yelled, "Fuck you, white bitch! Call whoever the fuck you want to! You don't belong here!"

56. Eventually, Medication Distribution Manager Bessie Crawford had to de-escalate the situation.

57. After that, the incident was written up and reported to Warden Miller.

58. On July 20, 2020, in the course of her work, Plaintiff was walking near Inmate Smith, who was talking with black female officers.

59. Twice on that day, clearly in an effort to make sure Plaintiff heard him, Mr. Smith spoke about 'taking the girl who lied on me to court…".

60. The black female officers did nothing to encourage Mr. Smith to stop making these statements nor did they dispute them in any way.

61. On several occasions, Officer Jenkins (black female) would come around while Plaintiff was distributing medications to inmates and stare directly or speak loudly, harshly, and threateningly at Plaintiff.

62. Officer Jenkins never treated any of the other nurses in this way.

63. On or around August 7, 2020, while Plaintiff was administering medications to inmates, Officer Jenkins yelled and cursed at Plaintiff and called her a "white dog."

64. On August 16, 2020, Officer Jenkins interrupted a comment made by Plaintiff to another office (i.e., Officer (FNU) Rhodes) and again initiated an unprovoked loud and harsh tirade against Plaintiff.

65. Plaintiff did not want to write up all these incidents.

66. She knew that working in a prison meant dealing with difficult circumstances.

67. However, Plaintiff felt she needed to document some of these incidents to ensure that the race discrimination and retaliation she was experiencing would be addressed.

68. Following the incident on August 16, 2020, Plaintiff wrote up an incident report to document Officer Jenkins' discriminatory and retaliatory behavior.

69. On August 19, 2020, Plaintiff emailed Deputy Commissioner of Institutions Jeworski Mallett and sent a copy of her incident report from occurrences during August 16-18, 2020.

70. In that incident report, Plaintiff wrote that, "I am the only white female nurse in my area and no other of my co-workers experience the targeting, profiling and harassment as I do…".

71. Mr. Mallett forwarded this incident report with its complaint of race discrimination/harassment to Warden Miller.

72. On September 6, 2020, Plaintiff received a letter suggesting that an inmate was trying to get people outside of the prison to harm her and members of her family.

73. It appeared to be from Inmate Smith and referred to Plaintiff being sued and losing her nursing license.

74. Inmate Smith continued to remain free to roam the compound with no additional restrictions.

75. On September 27, 2020, around 1:50 p.m., Plaintiff went to the restroom.

76. While Plaintiff was there, someone knocked. Plaintiff called out, "In use." The person kept knocking. Again, Plaintiff called out, "Someone is in here." Officer Franklin responded, "What are you doing in there?" Plaintiff responded, "Ma'am, I am trying to use the restroom." Officer Franklin did not reply.

77. When Plaintiff finished and came out, Officer Franklin was there and stated, "Are you okay?!" in a hostile tone.

78. Plaintiff said she had an upset stomach and headed back to 720 Shift Command.

79. Officer Franklin followed her all the way there.

80. Plaintiff wrote the incident up against Officer Franklin for workplace harassment and intimidation.

81. Around 2 p.m. that same day, Plaintiff began distributing medications to inmates.

82. Sergeant Bass approached Plaintiff's pill line and began interfering with Plaintiff as she attempted to pass out medications and give medication instructions to the inmates.

83. At one point, Sergeant Bass even denied one inmate his medication.

84. Plaintiff explained to Sergeant Bass that the doctor had ordered the medication in a specific way.

85. Sergeant Bass responded harshly, "Well, ya'll need to get the provider to change the order."

86. Plaintiff then asked Sergeant Bass why her pill line was being observed and interfered with while other pill lines were being ignored entirely.

87. Sergeant Bass made no reply.

88. On October 8, 2020, Plaintiff attempted to go the restroom for staff located behind shift command.

89. On her way there, however, Maximum Security Unit (MSU) Tower Officer (black female - name unknown) on shift at that time, informed Plaintiff that she was not allowed to go to the restroom in that area, according to Captain (FNU) Davis (black female) and Sergeant Bass.

90. Plaintiff then went to Shift Command to ask why this directive had been issued.

91. She found Captain Davis, Sergeant Bass, and Warden (FNU) Shivers (black female) sitting outside of Shift Command.

92. Plaintiff described what she had been told by the MSU Tower Officer.

93. Captain Davis stated, "That is not true," and Plaintiff said, "Well that is what the MSU Tower Officer told me."

94. Warden Shivers then had the MSU Tower Officer come to Shift Command, and then it was confirmed that the directive had been given by Captain Davis and Sergeant Bass.

95. Warden Shivers then stated to Captain Davis and Sergeant Bass that they could not deny an employee access to the restroom.

96. Captain Davis then looked at Plaintiff and stated, "You are always writing up incident reports on people. You are always looking for things to write up."

97. Captain Davis then went on to complain about how Plaintiff had written up Officer Jenkins. (To review, Plaintiff wrote up Officer Jenkins for the way she treated her (Plaintiff) when she wrote up Inmate Smith (see above).

98. At that time, Plaintiff complained of race discrimination and had suffered ongoing retaliation in the form of harassment from various black officers since that time.)

99. Plaintiff attempted to demand what any of Captain Davis's statements had to do with preventing her (Plaintiff) from using the restroom, but Captain Davis kept interrupting her and accusing her of writing officers up.

100. Later that same day (i.e., October 8, 2020), feeling very frustrated that she was continuing to be discriminated against and retaliated against due to her race, Plaintiff reported this incident and the aftermath of it to Superintendent Ron King (white male).

101. He responded that he would investigate the matter further.

102. On October 26, 2020, Nurse Sandra Lampkin (black female) and Mr. (FNU) Peters (black male) came to 720 Med Distro (where Plaintiff works primarily) and spoke with Nurse Beverly Adams (black female).

103. Nurse Lampkin and Mr. Peters asked Nurse Adams to reconsider staying on as a full-time nurse, that she would be guaranteed her spot there at 720 Distro.

104. Nurse Adams politely declined the offer.

105. Nurse Lampkin and Mr. Peters then spoke with Plaintiff and stated there would soon be schedule changes made for her.

106. Plaintiff stated that she would prefer to stay in the position and the schedule she was in.

107. Nurse Lampkin stated she would "respect whatever decision [Plaintiff] made" but the schedule changes were going to happen.

108. Beginning on October 27, 2020, Plaintiff's schedule placed her in different areas every day.

109. Plaintiff addressed the issue with Nurse Adams who agreed with Plaintiff that the schedule changing was motivated by a deliberate effort to get Plaintiff to resign.

110. On November 7, 2020, Sergeant McLentee (black male) met with Plaintiff and warned her that it was discussed in Shift Command that she was fraternizing too much with inmates.

111. Plaintiff responded that she adamantly disputed the allegation.

112. Plaintiff further noted that consistently she moved inmates through pill line faster than the other nurses (i.e., black females).

113. Inmates were often at the lines of the other nurses for as long as 30 minutes, yet only she (Plaintiff) was warned or reprimanded for allegedly fraternizing, whereas none of the black nurses were ever warned or reprimanded in this way.

114. Sergeant McLentee recommended that Plaintiff to address the situation with someone higher up the chain of command.

115. On November 27, 2020, Plaintiff filed an EEOC Charge of Discrimination due to race, against MDOC/CMCF (Charge #: 570-2021-00201).

116. On December 29, 2020, in response to Plaintiff's Charge, MDOC submitted a Position Statement to the EEOC.

117. MDOC's Position Statement alleges that Ms. Jenkins' behavior toward Plaintiff is explainable due to nondiscriminatory reasons.

118. Plaintiff contends that during the latter half of 2019 went on, black female officers such as Sergeant (FNU) Bass, Lt. Paulette Franklin, and Officer Jenkins often harassed Plaintiff while she was administering medications to inmates.

119. They would speak in loud and hostile voices toward both the inmates and toward Plaintiff while Plaintiff engaged in the important and delicate process of ensuring that the correct medications were administered to the correct inmates.

120. This harassment made it very difficult for Plaintiff to focus on this task and increased the potential likelihood of a medication error occurring.

121. These same officers never treated black nurses in this manner.

122. MDOC's Position Statement also alleges that Plaintiff "never stated that she thought Officer Jenkins was discriminating against her based on her race."

123. Plaintiff adamantly contends that this allegation is categorically false.

124. Plaintiff maintains that on May 4-5, 2020, she complained to Warden Miller about how the black female officers (listed above) were racially discriminating against her and retaliating against her (i.e., because of her write up of inmate John Smith).

125. On or around August 18, 2020, Plaintiff emailed a complaint of how she was being racially discriminated against to MDOC's Deputy Commissioner of Institutions Jeworski Mallett.

126. In the incident report she sent to Mr. Mallett, Plaintiff notes that "I am the only white female nurse in my area and no other of my co-workers experience the targeting, profiling, and harassment as I do…".

127. On October 8, 2020, Plaintiff complained of race discrimination to Superintendent Ron King following the incident in which Captain Davis and Sergeant Bass had directed Plaintiff to be denied access to the restroom.

128. On January 27, 2021, Plaintiff filed an amendment of the same Charge of Discrimination (Charge #:570-2021-00201) so that it was for charges of race discrimination, hostile work environment, and retaliation, and filed it against both MDOC/CMCF and VC.

129. Despite repeated requests by the EEOC to respond to Plaintiff's Charge of Discrimination, VC never responded with a Position Statement.

130. On March 5, 2021, in response to Plaintiff's amended Charge of Discrimination, MDOC submitted another Position Statement to the EEOC.

131. MDOC's second Position Statement alleges that Warden Miller has "no record of receiving such documentation" regarding the incident on June 4, 2020, reported by Plaintiff, in which Lt. Franklin yelled, "Fuck you, white bitch! Call whoever the fuck you want to! You don't belong here!" to Plaintiff.

132. Plaintiff contends that she reported this incident in extensive detail and expressed how frustrating it was to be discriminated against based on her race in such an egregious way.

133. Specifically, Plaintiff contends, as noted above, that after she emailed her incident report of the events of August 16-18, 2020, which included a complaint of race discrimination/harassment to Mr. Mallett, Mr. Mallett forwarded that email on to Warden Miller.

134. This is known to Plaintiff because Warden Miller came to her about it and stated that he had learned about the matter from Mr. Mallett.

135. Plaintiff further contends that she had previously reported the earlier episodes of race discrimination/harassment to Warden Miller verbally and in detail.

## CAUSES OF ACTION

### COUNT I: VIOLATIONS OF 42 U.S.C § 1981 and TITLE VII – RACE DISCRIMINATION

136. Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 135 above as if fully incorporated herein.

137. As described in more detail above, Defendants discriminated against Plaintiff because of her race which constitutes a violation of both 42 U.S.C § 1981 and Title VII of the Civil Rights Act of 1964.

138. Plaintiff has suffered lost wages, benefits and other pecuniary losses as well as deep, humiliation, anxiety and emotional distress.

139. The unlawful actions of Defendants complained of above were intentional, malicious, and taken in reckless disregard of the statutory rights of Plaintiff.

### COUNT II: VIOLATIONS OF 42 U.S.C § 1981 and TITLE VII – RACE/HOSTILE WORK ENVIRONMENT

140. Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 139 above as if fully incorporated herein.

141. As described in more detail above, the actions of the Defendants constitute racial harassment and created a hostile work environment for the Plaintiff.

142. The acts of the Defendants constitute a willful and intentional violation of both 42 U.S.C § 1981 and Title VII of the Civil Rights Act of 1964 and entitle Plaintiff to recovery of damages, both compensatory and punitive in nature.

### COUNT III: VIOLATIONS OF 42 U.S.C § 1981 and TITLE VII – RETALIATION

143. Plaintiff re-alleges and incorporates all averments set forth in paragraphs 1 through 142 above as if fully incorporated herein.

144. As described in more detail above, the actions of the Defendants constitute unlawful retaliation against Plaintiff after she engaged in protected activity.

145. The retaliatory acts of the Defendants constitute a willful and intentional violation of both 42 U.S.C § 1981 and Title VII of the Civil Rights Act of 1964 and entitle Plaintiff to recovery of damages, both compensatory and punitive in nature.

### PRAYER FOR RELIEF

**WHEREFORE PREMISES CONSIDERED,** Plaintiff respectfully prays that upon hearing of this matter by a jury, the Plaintiff be granted the following relief in an amount to be determined by the jury:

1. Back wages and reinstatement; or
2. Future wages in lieu of reinstatement;
3. Tax gross-up and all make-whole relief;
4. Compensatory damages;
5. Punitive damages;
6. Lost Benefits;
7. Pre-judgment and post-judgment interest;
8. Attorney fees and costs; and
9. Such other relief as the Court deems just and appropriate.

THIS the 24th day of February 2023.

              Respectfully submitted,

              LISA CRAWFORD, Plaintiff

           By: /s/ Louis H. Watson, Jr.
             Louis H. Watson, Jr.  (MB# 9053)
             Nick Norris (MB# 101574)
             Attorneys for Plaintiff

OF COUNSEL:

WATSON & NORRIS, PLLC
4209 Lakeland Drive # 365
Flowood, Mississippi 39232-9212
Telephone: (601) 968-0000
Facsimile: (601) 968-0010
Email: louis@watsonnorris.com
Email: nick@watsonnorris.com
Web:  www.watsonnorris.com