```
 1              IN THE UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF MISSISSIPPI
 2                    NORTHERN DIVISION

 3   LISA CRAWFORD                              PLAINTIFF

 4   VS.                    CAUSE NO.: 3:23-cv-140-TSL-MTP

 5   VITALCORE HEALTH STRATEGIES, LLC          DEFENDANT

 6

 7       ****************************************
 8
                 DEPOSITION OF LISA CRAWFORD
 9
         ****************************************
10

11

12            Taken via Zoom videoconference,
                 on Tuesday, May 21, 2024,
13          beginning at approximately 9:55 a.m.

14

15

16

17

18

19       ****************************************
20               CATHY M. WHITE, CCR
              Certified Court Reporter #1309
21                   Notary Public

22

23

24

25
```

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
Lisa Crawford on 05/21/2024

Page 2

```
 1        A P P E A R A N C E S
 2    (All parties present via Zoom videoconference)
 3
 4  NICK NORRIS, ESQUIRE
    nick@watsonnorris.com
 5  Watson & Norris
    4209 Lakeland Drive #365
 6  Jackson, Mississippi  39232
    601.968.0000
 7
            COUNSEL FOR PLAINTIFF
 8
 9  HIAWATHA NORTHINGTON II, ESQUIRE
    hnorthington@grsm.com
10  Gordon Rees Scully Mansukhani
    1000 Highland Colony Parkway, Suite 5203
11  Ridgeland, Mississippi  39157
    601.427.6239
12
            COUNSEL FOR DEFENDANT
13
14  ALSO PRESENT:  Jessica McLawn
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                INDEX
 2
    Style . . . . . . . . . . . . . . . . . . .   1
 3
    Appearances . . . . . . . . . . . . . . . .   2
 4
    Index . . . . . . . . . . . . . . . . . . .   3
 5
    Examination by Mr. Northington . . . . . . .   4
 6
    Certificate of Court Reporter . . . . . . . 122
 7
    Certificate of Deponent . . . . . . . . . . 123
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                 LISA CRAWFORD,
 2  having been duly sworn, was examined and testified as
 3  follows:
 4                  EXAMINATION
 5  BY MR. NORTHINGTON:
 6     Q.   Good morning, Ms. Crawford.  My name is
 7  Hiawatha Northington and I'm an attorney representing
 8  VitalCore Health Strategies in an action that's been
 9  filed in the United States District Court for the
10  Southern District of Mississippi.  Are you familiar
11  with the lawsuit?
12     A.   Yes, sir.
13     Q.   Okay.  I'm going to be asking you some
14  questions about your complaint and the incidents
15  surrounding it.  Have you ever given a deposition
16  before?
17     A.   Yes, sir.
18     Q.   Okay.  So you're familiar with the way this
19  works.  And with a little caveat because we're doing
20  this via Zoom, I'm going to do extra special to make
21  sure that I take my time with my questions so our
22  court reporter can get everything down, and I'll
23  also -- you'll find me giving a little bit of extra
24  pause so that, you know, if there's any lag in
25  communications or connections or anything, we can make
```

Page 5

```
 1  sure that the court reporter gets everything down
 2  clearly.
 3     A.   Thank you.
 4     Q.   Okay.  With regard to this particular
 5  lawsuit, other than your attorney, Mr. Norris, or
 6  somebody from his firm, have you discussed the
 7  complaint or the petition with anyone else?
 8     A.   No, sir.  My -- I have Ed Williams.  He is my
 9  attorney, as well.  He does know that I have a
10  lawsuit, but I've not discussed it with him.
11     Q.   Okay.  I'm not interested in any conversation
12  you had with any of your attorneys.
13     A.   Okay.
14     Q.   Just anybody else outside of that?
15     A.   No, sir.
16     Q.   Okay.  If you could, give us the benefit of
17  your educational background, Ms. Crawford.
18     A.   Okay.  I received my GED in 2005.  I went to
19  college to be a nurse at Hinds Community College.  I
20  graduated in 2018 with honors as a licensed practical
21  nurse with an expanded IV role therapy.
22     Q.   Okay.  And where did you grow up?
23     A.   I grew up in Pisgah, Mississippi.
24     Q.   I know exactly where that is.
25          So other than your education that you
```

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
Lisa Crawford on 05/21/2024

Page 6

1  received at Hinds for licensed practical nursing, have
2  you had any other specific educational or higher
3  educational training?
4      A.  Just CPR certification.
5      Q.  Okay.  And is that something that you have to
6  maintain regularly?
7      A.  I do, yes, sir.
8      Q.  Is that annually?
9      A.  I believe it's every two years.
10      Q.  Okay.  And in the nursing arena, what job did
11  you -- strike that.  I'll ask a better question.
12          Following you receiving your training at
13  Hinds, where did you first start using your LPN
14  training?
15      A.  At Central Mississippi Correctional Facility.
16      Q.  Okay.  And were you working for CMCF itself,
17  or were you working for one of its contractors?
18      A.  I worked for Centurion, which contracted me
19  to CMCF.
20      Q.  Okay.  What was your job title with
21  Centurion?
22      A.  LPN, med distro nurse.
23      Q.  When you say "med distro," you mean medical
24  or medicine distribution?
25      A.  Medical distribution at the prison, yes.

Page 7

1      Q.  Okay.  Were you required to do any time --
2  that's bad phrasing.
3          Were you required to do any work at any
4  facility other than Central Mississippi?
5      A.  No, sir.
6      Q.  So once you started working with Centurion as
7  an LPN, the only facility you were assigned to was
8  Central Mississippi?
9      A.  Yes, sir.
10      Q.  And what was your job responsibility as
11  a medical distribution?
12      A.  I was responsible for administering
13  medications and insulin to the offenders.  We
14  monitored their glucose and reported their glucose
15  levels.  We did the KOP medications, which are keep on
16  person.  We made sure they were processed and
17  delivered from pharmacy.  Patient well-being, patient
18  instruction on the medications.  We assessed vitals,
19  pulse ox, blood pressure.  We did stock supplies,
20  medical stock supplies.  We did medication inventory
21  for pharmacy and kept -- and reported to pharmacy,
22  reported to the providers and the supervisors, and I
23  delegated -- and any delegation from my supervisors
24  within my scope of practice was done there.
25      Q.  Okay.  And I heard you describe earlier the

Page 8

1  insulin.  Were you limited to only treating patients
2  that were diabetic?
3      A.  No, sir.
4      Q.  Okay.  So you were -- that was just part of
5  your overall treatment in terms of the detainees or
6  offenders who were being held there?
7      A.  Yes, sir.
8      Q.  Were there any other specific kinds of
9  illnesses or diseases that you were required to treat
10  other than the diabetics?
11      A.  Oh, yes, sir.  I mean, we had -- 720 was --
12  there's many different areas there.  720 was just
13  where I originally started.  It was the only area that
14  had two nurses.  My supervisor, Ms. Bessie Wheaton,
15  she put me there knowing that I was new to the, you
16  know, to the correctional nursing.  So I had over --
17  720 was 720 patients, which were well over that.  So I
18  had a huge number --
19      Q.  Right.
20      A.  -- of patients.
21      Q.  So 720 -- I'm sorry.  720 was the general
22  area that was assigned to the entire facility?
23      A.  No, sir.
24      Q.  It wasn't?
25      A.  No, sir.  Med distro had different nurses

Page 9

1  assigned at different areas, but we were all to know,
2  all be able to work at any area at any time in case,
3  you know, there was an emergency or a need or someone
4  didn't show up.
5      Q.  Okay.  And I guess that's probably a better
6  way of framing what I was trying to ask earlier.  So
7  in terms of the med distribution, med distro, was
8  there any other area that you were assigned to other
9  than med distro?
10      A.  No, sir.  I was classified as med distro.
11      Q.  Okay.  And you mentioned Ms. Wheaton.  I know
12  you said she hired you, put you there.  Would you
13  consider Ms. Wheaton your supervisor?
14      A.  She was.
15      Q.  Okay.  And was she an RN?
16      A.  She was an LPN.
17      Q.  LPN.  Okay.  And she was employed by
18  Centurion, as well?
19      A.  Yes, sir.  She and I both later did become
20  part of VitalCore.
21      Q.  Sure.  Yeah, I was going to get to that
22  shortly.
23      A.  Okay.
24      Q.  In terms of your work as an LPN, did you have
25  to report to anybody else other than Ms. Wheaton --

LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC
Lisa Crawford on 05/21/2024

Page 10

1    A.    Yes, sir.
2    Q.    -- when you started?
3    A.    Yes, sir.
4    Q.    Who was that?
5    A.    We had a chain of command.  Ms. Sam Lampkin
6  and Mr. Paxton Page were the HSA and assistant HSA at
7  the time.
8    Q.    So Ms. Lampkin was the HSA?
9    A.    Yes, sir.
10    Q.    What was the second gentleman's name?  I'm
11  sorry.
12    A.    Paxton Page.
13    Q.    Page.  Okay.  And when you started working at
14  Centurion, do you remember what your salary was then?
15    A.    Around $16 an hour.
16    Q.    And would you routinely work 40 hours a week?
17    A.    I worked overtime in the beginning.  I helped
18  fill in a lot, so yes, sir.
19    Q.    And the overtime that you got, it wasn't
20  regular overtime.  It just varied depending on the
21  circumstances?
22    A.    Well, Centurion had different pay.  They did,
23  you know, different pay levels on weekends and things
24  like that.  So they had a lot of different pay than
25  VitalCore.

Page 11

1    Q.    Gotcha.  But in terms of how often you had to
2  do the overtime, was it a regular set amount of
3  overtime that you had to do, or did it just vary
4  depending on the need?
5    A.    It varied.
6    Q.    Okay.
7    A.    And they sometimes offered incentive pay, is
8  what I'm trying to say.
9    Q.    I understand.  Okay.  So when you began
10  working at Centurion and working within the Central
11  Mississippi facility, tell me about what you found
12  when you started working there.  Were you responsible
13  for working -- I know you described that there were
14  several nurses within where you were working.  Was
15  there a small team that you were working with
16  primarily or did that change, too, depending on the
17  situation?
18    A.    Okay.  There's a whole medical facility here
19  at the prison, at CMCF.  So they divided us up and we
20  were called med distro team, med distro.  So we had --
21  there was also a clinic, you know, where there was
22  providers, there were RNs at all times, so -- and
23  there's quite a large area here we have of different
24  -- where the inmates are housed.
25    Q.    Uh-huh.

Page 12

1    A.    But it was -- for me, it was med distro as
2  far as our -- we were, I guess our little team group,
3  so where I was -- we normally worked one nurse to
4  every area but 720.  720 had two nurses.  So, yes, in
5  a way, with me and whomever I was working with in 720,
6  we were away from the others.
7    Q.    Okay.
8    A.    It's a quite large place out there.
9    Q.    Right.
10    A.    You're familiar with it.
11    Q.    Yeah, yeah.
12          And when you were working in med distro with
13  Centurion -- well, two questions.  First, I know you
14  had to deal with offenders regularly.
15    A.    Yes.
16    Q.    How often did you have to deal with the
17  Department of Corrections employees?  Was it just as
18  regularly?
19    A.    Yes, sir.
20    Q.    Yeah?  So I know you didn't have to
21  necessarily report to anyone, but did you have a
22  particular point person that you would have to deal
23  with in terms of Department of Corrections employees?
24    A.    When I first started, I -- everything mainly
25  went through Nurse Bessie.

Page 13

1    Q.    Okay.
2    A.    If I had any problems, I went to her and she
3  went to everyone else from there.
4    Q.    Gotcha.  When you started working at
5  Centurion, do you remember what date that was?  I know
6  it was sometime in 2018.
7    A.    Yeah.  April 16th.
8    Q.    Okay.  And how long did you work for --
9    A.    It was April 16, 2019.
10    Q.    2019.  Okay.
11    A.    Yes, sir.
12    Q.    Got it.  How long did you continue to work
13  for Centurion before VitalCore took over for
14  Centurion?
15    A.    I believe they took over in October of '20,
16  2020.
17    Q.    Okay.  And just so you know, this is not a
18  memory test.
19    A.    Good.
20    Q.    These dates might not be exactly, you know,
21  jive with some other stuff that we may have.  I'm just
22  trying to get your best recollection at this time.
23    A.    Okay.
24    Q.    But that won't be held against you for any
25  reason.

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
**Lisa Crawford on 05/21/2024**

Page 14

1    A.   Okay.

2    Q.   **In terms of then the lawsuit or the -- well,**
3  **let's go back before the lawsuit.  Do you recall**
4  **filing an EEOC complaint against the Department of**
5  **Corrections?**

6    A.   Yes, sir.

7    Q.   **And I know that eventually you amended the**
8  **complaint and brought in VitalCore.  Do you recall**
9  **that?**

10    A.   I do believe so.  I mean, I didn't do it
11  myself, but I know there was an amendment.

12    Q.   **Right.  I want to talk to you first about the**
13  **MDOC before you brought in VitalCore.**

14    A.   Okay.

15    Q.   **Can you explain to me what led you to filing**
16  **the initial EEOC complaint?**

17    A.   Yes, sir.  The first incident I had against
18  the MDOC was -- do I need to just tell you the date or
19  tell you the whole thing, what happened?

20    Q.   **Well, you know, you can tell me about it.  I**
21  **may stop you and ask you some questions based on --**

22    A.   Okay.  Well, the first incident I had was
23  around June or July of '19.  I was so still fairly new
24  there, you know.  I hadn't been there too long.  So
25  it's a large complicated facility there.  You know,

Page 15

1  you have to go through so many procedures.  You have
2  to go through security coming in the door.  You have
3  to get to your nursing post.  So the headquarters are
4  in RNC, which they're way over in another building.
5  What I'm trying to say here is, at 720, we're supposed
6  to have officers at all times.  They're extremely
7  short-staffed.

8    Q.   **Okay.**

9    A.   So when I'm leaving, I'm going through kind
10  of a dangerous situation as it is because there was no
11  officer that day.

12    Q.   **Okay.  Let me stop you right there.  When you**
13  **say "officer," are you talking about employees of MDOC**
14  **who were supposed to be there?**

15    A.   Well, yes, sir.  They were understaffed.

16    Q.   **Okay.  But I just want to make sure, you're**
17  **not talking about somebody who was -- and this was**
18  **2019.  So you're not talking about somebody that was a**
19  **Centurion employee that was supposed to be there.**
20  **You're talking about the MDOC folks that were supposed**
21  **to be there to, like, escort or protect you or**
22  **whatever?**

23    A.   Well, I can't say if there was not somebody
24  there that should have been for Centurion that day
25  because all I can remember is what happened when I was

Page 16

1  leaving.

2    Q.   **Okay.**

3    A.   And it was pretty traumatic.  So kind of
4  everything else kind of leaves my mind, you know, when
5  I got caught in that situation.  But I was leaving
6  that day and -- to go home.  My son and my father --
7  my father -- their father, were waiting on me.  They
8  had to go to a family reunion.  So as I was leaving, I
9  had to go down a long corridor to get out.  There was
10  no one in the one area of the -- where the -- the key
11  control.  So I had to go down with what an --
12  unfortunately, the only name I know for it is -- the
13  nurses told me it was rape trap hall, because it was a
14  long corridor where, if an inmate caught you in there,
15  there was no way anybody could get to you.  And they
16  knew that.

17    Q.   **Did you say "rape trap"?**

18    A.   Rape trap hall.  That's what the nurses
19  called it.

20    Q.   **Okay.**

21    A.   So you know -- and the reason I believe they
22  said that is because, like I said, it's a long hallway
23  where, if there's an offender there and he knows
24  there's no officers, there's no way they can get to
25  you before them.

Page 17

1    Q.   **Okay.**

2    A.   I have to go through there to get out into
3  the -- where they have visitation.  It's a large room
4  they have visitation.  So as I walk in there, I
5  immediately notice that, you know, it was full of
6  offenders.  And so, you know, I've been through some
7  training already up front.  I know where I'm at.  I
8  know, you know, that they play games and, you know, so
9  I don't look at them.

10    Q.   **Right.**

11    A.   I walk straight to just try to get out.  So I
12  had to go a little ways up and to go through key
13  control.

14    Q.   **Uh-huh.**

15    A.   And at this point, I didn't even know if
16  anybody was in key control because there was no one at
17  the main place to let me out.  I don't know the proper
18  terminology of that station where you can go straight
19  through out instead of having to go around through the
20  visitation hall.

21    Q.   **So when you say "key control," you're talking**
22  **about somebody who controls the opening and closing of**
23  **doors?**

24    A.   Yes, sir.  And they have our vehicle keys
25  inside.

LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC
Lisa Crawford on 05/21/2024

Page 18

1    Q.   Okay.

2    A.   So I -- as I went there, I noticed that the
3  gate was shut to let me out.  So I did see an officer
4  inside the key control, because it's glass, because
5  they have to be able to see in to look at the
6  offenders, and plus you, through the glass.  So I
7  went -- well, I waited at the gate because she saw me
8  standing there and, you know, she didn't open it.  So
9  I waited.  You know, I didn't know what was going on,
10  so I waited.

11       Well, you know, about five minutes went past,
12  you know, and I mean, that's a long time.  It may not
13  sound long, but when you're standing there with a
14  large group of inmates behind you, you know, it's a
15  long time, because at this point, I'm like, why is she
16  not opening the door.  So I went to the window and
17  knocked on it, and she picked the phone up.

18       Well, you know, I was getting concerned here
19  because why didn't you let me out.  So I didn't turn
20  around because, all of a sudden, I knew -- well, the
21  inmates are making comments behind me, on top of this,
22  because I'm a female.  So I'm trying to ignore that,
23  but they're starting to tell me, you know, they're
24  laughing, you know.  She's not letting you out, you
25  know.  And I'm not looking at them or engaging with

Page 19

1  them at all because I start thinking, well, if I have
2  to run, there's no way for me to get out of there.
3  And I immediately became frozen in panic, you know.

4    Q.   Now, the area where you're describing, is
5  there anything that is separating you from the
6  offenders?

7    A.   No.  No, sir.

8    Q.   So basically, you may not be right there
9  together, but you're in the same space?

10    A.   Oh, yes, sir.

11    Q.   Okay.  And to go back a little bit, that
12  hallway, do you know how the offenders got to that
13  location or how they got where they were?

14    A.   Well, they're -- at the end -- Okay.  Coming
15  up past the clinic, if they had had the door open, the
16  visitation, I could have went right to go straight
17  into visitation through a little laundry area, or I
18  could have went straight out through the main gate.
19  So that door was closed.  So they had offenders -- so
20  the offenders had obviously -- I can't say, I wasn't
21  there --

22    Q.   Sure.  Yeah.

23    A.   -- to see if they went in there, but if I had
24  to -- they went through the door and then they shut
25  the door so they could not come out.

Page 20

1    Q.   Right.

2    A.   Except they still could have gotten up that
3  hallway if they would have ran and they could have
4  come out through the -- so I had to go up to the end
5  of the hallway to the right, and down through the long
6  hallway, which -- and then go out through into the
7  visitation.  So I knew, you know, if they wanted to,
8  they could do anything they wanted.

9    Q.   Okay.

10    A.   So, you know, I froze with terror, really.

11    Q.   Yeah, yeah.

12    A.   And my family was out there, and we had to
13  be -- you know, to get my children there a certain
14  time.  And so I started, you know, I started banging
15  on the door, banging on the gate, you know, please
16  just let me out, and she just continued to ignore me,
17  you know, and I -- you know, about this time, you
18  know, I'm going back and forth to the window and I'm
19  at the gate and the offenders are steadily saying
20  things to me which were vulgar, you know, sexual
21  comments.

22       So all I remember is that it's about 15
23  minutes now, and I saw a figure come in through --
24  there's another -- where you come in the front door to
25  the facility.  I saw a figure come in there and the

Page 21

1  gate, and I said, "Please help me," and the gate
2  opened immediately.  I went through the gate and
3  there's another gate that has to be open, because you
4  get in that one gate, so --

5    Q.   Open one gate, get you in the space, then
6  open up the second gate, you get out?

7    A.   Yes, sir.  Because in that space is where you
8  can go into key control and get your keys, or they can
9  hold you there, whatever they have to do.

10       So I went through that and she opened the
11  next gate, and I went through there, and I saw -- you
12  know, I noticed it was an officer, a special officer,
13  either K-9 or CID, was in all black.  And as soon as I
14  came out to him, I had not said anything to him
15  except he had heard me say, "Please help me get out."
16  She came out immediately.  And her name is Officer
17  Jenkins.

18    Q.   I was about to say Officer --

19    A.   I didn't know -- yes, sir, Officer Jenkins.
20  I'm sorry.  I didn't know it at the time until that
21  happened.  She came out, I mean, in a very just fast,
22  hostile manner, automatically -- and I haven't even
23  said anything to him.  She comes out and she's like,
24  with a loud voice, you know, "Bitch, I didn't leave
25  you in there.  I didn't lock you in that gate," just,

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
Lisa Crawford on 05/21/2024

Page 22

1  you know -- and I put my hand up because I'm like
2  what, you know, what's going on here.  I said, "Ma'am,
3  you can step back.  You don't have to talk to me like
4  that."  And I told her, I said, "That just says that
5  you did because I haven't even told this man about it.
6  You know, that tells me you know what happened."
7      Q.   Uh-huh.
8      A.   So she kept on being very hostile with me,
9  and I said -- well, you know, I didn't know what to
10  do.  This was my first time ever to be in such a
11  situation.  I mean, I was shaking.  And he just said,
12  the officer said, "Ma'am, you need to write her up."
13      Q.   You're talking about the officer that had on
14  all black?
15      A.   Yes, sir.
16      Q.   Okay.
17      A.   And now his name as well the officer I
18  called, they're in the reports.
19      Q.   Right.
20      A.   He picked up the phone.  I didn't even know
21  how to get to the phone to pick -- to call to the
22  shift commander, who the shift commander is back in
23  720.  So he picked up the phone and called back there
24  into the captain who was on duty, the female.  She was
25  a female.  And she can tell that I was in panic and

Page 23

1  terror.  And she told me, you know, just calm down and
2  I needed to write an incident report, but she said I
3  have 24 hours.  So she advised me to -- it was well
4  noted that this had happened, and she told me I could
5  go ahead and leave.
6      Q.   Okay.
7      A.   Because due to the panic and all.  I mean, I
8  was terrified.  So she let me leave.  And I left there
9  and my husband -- I didn't have to get any keys that
10  day because my husband dropped me off that morning and
11  he was there waiting on me.
12           And so the next day when I come to work, I
13  went straight to Ms. Bessie with this.  She was
14  already waiting on me.  So I went there and, from
15  there, I told her everything that happened.  She wrote
16  it up as far as the MDOC goes with the captain and the
17  male officer.  She wrote all that into the report.
18  But I still wrote out a hand report.
19      Q.   Right.
20      A.   And she made sure I was okay, and she assured
21  me they were going to handle this.  Ms. Bessie was
22  really wonderful about, you know, she made sure I was
23  safe.  And I told her I was, you know, I would
24  continue on as long as there were officers there, and
25  there were.

Page 24

1           So I went to my post that day at 720 and,
2  sometime that morning, Ms. Lampkin and Mr. Page came.
3  I believe it was Mr. Page.  She had a male with her at
4  the time that was her assistant.
5      Q.   Okay.
6      A.   And I wrote out a hand report to her and they
7  just sat in there in the break room at 720 and talked
8  with me about it, you know, made sure that I was okay,
9  you know, that I understood that that's not tolerated
10  there, that, you know, Centurion does not stand for
11  that, and that this whole situation would be dealt
12  with.  They assured me of that.  And that was -- would
13  happen that day.
14      Q.   Now, did they give you -- Ms. Lampkin and her
15  assistant HSA, did they give any kind of document?  I
16  know you said you wrote it up, but did they give you
17  any other kind of document that you had to provide to
18  Centurion regarding the incident?
19      A.   They may have through Ms. Bessie in her
20  office that day.  I can't recall at this moment.
21      Q.   Okay.
22      A.   Because Ms. Bessie usually handled everything
23  and, if I signed it in her office, you know, I'm not
24  sure at this moment.
25      Q.   Okay.  Did Ms. Lampkin or her assistant give

Page 25

1  any idea or understanding what the next step would be
2  for Centurion at that point or what they would be
3  doing next?
4      A.   I'm not sure, really.  She did tell me --
5  they did tell me, but I'm really not sure of the
6  process that -- what we went through after that
7  because, you know, there's a lot that happened after
8  that.  So I'm not sure, because I know, at some point,
9  we do go to the superintendent --
10      Q.   Right.
11      A.   -- with this situation.  So I'm not sure
12  what -- how it got there from here at this moment.
13      Q.   Okay.  So, Ms. Crawford, going back to the
14  incident, was there any ultimate kind of action taken
15  against Officer Jenkins, the security officer, or
16  whatever kind of officer she was, who was working the
17  gate that you know of?
18      A.   I really do not know.  I really can't say if
19  they said they reprimanded her.  I'm not sure, because
20  we were interviewed separately, of course, by
21  Superintendent King, and I'm not sure who the other
22  female was.  He had, of course, someone with him.
23      Q.   Okay.  But in terms of a hierarchy or
24  responsibility for her, she wasn't somebody who was
25  working for Centurion.  She was working for MDOC?

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
**Lisa Crawford on 05/21/2024**

Page 26

1    A.   She definitely -- I mean, she's not a medical
2 worker, no, sir.
3    Q.   Right.  Okay.  Did you ever learn of whether
4 or not -- I know we talked about the situation on how
5 the hall was set up.  Did you ever learn subsequently
6 whether or not there were MDOC officers who were
7 supposed to be there that weren't there or what the
8 reason was of why she was the only officer present?
9    A.   To be honest with you, okay, I have so many
10 responsibilities as a nurse and with so many patients
11 that, you know, I really, as far as the MDOC and the
12 CMCF employees, Ms. Bessie handled that.  You know, I
13 I couldn't -- I didn't have -- I had so much in my own
14 job and duties that --
15    Q.   Right.
16    A.   -- I can't really -- I can't answer a whole
17 lot for their employee situation, because there were
18 so many officers, so many changes of the officers, you
19 know, and I don't know how they work.  I know they
20 were constantly short-staffed.
21    Q.   Okay.
22    A.   So I really can't answer for that, no, sir.
23    Q.   Okay.  That's fair.  I was just making sure I
24 understood what you might know.
25    A.   And that's very complicated, too.  So we're

Page 27

1 at a situation where we have medical and we have the
2 government officers and we have just MDOC officers.
3 So, you know, it's quite an interesting place to work,
4 I guess you would say, and it's quite complicated to
5 explain.
6    Q.   Yeah.  I understand.  Would it be fair to
7 say, at least at the time you were working there, that
8 the Centurion medical staff was only there to provide
9 medical services to the offenders?  They weren't there
10 to provide security services?
11    A.   Well, no, they were -- I was told that I
12 would always have protection, an officer with me
13 through them.  That was their job as far as I know.
14 Now, I was told that.  They also -- Mr. Page was --
15 Ms. Bessie had explained to him that he was the
16 liaison between medical and MDOC.  So they were
17 supposed to ensure that I was safe and I felt safe.
18 So, yes, sir, they did say that when I was hired.
19    Q.   All right.  Now, according to the
20 charge of discrimination, you allege that, after the
21 incident with Officer Jenkins and whatever write-up
22 you did about her -- I know it was characterized as a
23 grievance, but I'm not sure whether there was an
24 actual grievance.  You can tell me whether or not that
25 was true.  But either way, regardless, what you stated

Page 28

1 about Officer Jenkins, you're alleging that there was
2 retaliatory action taken after that?
3    A.   Yes, sir.  She never -- she was very upset
4 with me after that with her actions.
5    Q.   Tell me about how that -- what those
6 retaliatory actions consisted of.
7    A.   When I -- she was still left, you know, there
8 to do some duties, which, you know, like I said, they
9 could get moved any time to any area, so I can't keep
10 up with her schedule.  But when I would pass her in
11 the hallway, if I had to go into the clinic and she
12 was coming down the hallway in the facility, you know,
13 she was very harsh looking at me, you know, and very
14 rude passing me with her mannerism at the time, which,
15 you know, we didn't have another incident that I wrote
16 up, you know.  I know -- I mean, I can't write up
17 every single, you know, incident.  I'm not easily
18 offended, you know.  But it was in '20, you know, some
19 time had went by, she started -- it was when she got
20 back.  She might be stationed over there or she might
21 be stationed over at the other area.  So -- but I know
22 it was in the earlier parts of '20 before we actually
23 had something hostile enough for me to write up again.
24    Q.   Okay.  And tell me about what it was that
25 occurred that led you to write it up again.

Page 29

1    A.   Let's see.  I know it was in '20.  Well, she
2 was -- she would be over there in 720 in which she
3 would have -- like I said, I don't know her official
4 title, because some officers can only be assigned to
5 the buildings.  Ms. Jenkins obviously has a higher
6 title because she doesn't have to be assigned to one
7 building, but she might be there some days.  So she
8 was in any area, is what I'm saying.  So she might
9 have been my on-call officer that handled all the
10 other officers.
11    Q.   Okay.
12    A.   Whatever happened with the last time, I know
13 at some point she's constantly riding in a golf cart.
14 She's riding around in a golf cart.  And in my area,
15 in my medical room, I'm locked behind bars and I do
16 not have keys.  So I can actually see everything
17 that's going on from my window.  We have two doors
18 that come into a corridor in 720.
19    Q.   Okay.
20    A.   And they're responsible for letting out the
21 offenders.  So there's three buildings there, A, B,
22 and C, which are full of offenders in each building.
23 So -- well, I need you to kind of understand so you
24 can understand where this is coming from.
25    Q.   Yeah, yeah.

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
**Lisa Crawford on 05/21/2024**

Page 30

1    A.   Medical -- as medical nurses, I have to run a
2  medication pass.  So in the morning -- in the -- we
3  have three medication passes at this time.
4    Q.   Okay.
5    A.   We have a morning medication pass, a noon and
6  a p.m.
7    Q.   And when you say "pass," you're talking about
8  periods when you actually distribute the medication?
9    A.   Right.  Where the offenders are allowed to
10  come in to the room by however MDOC brought them.  And
11  normally it was by buildings or zones, and there were
12  times that they were all out.
13    Q.   Okay.
14    A.   So Ms. Jenkins, I mean, she was -- she just
15  had -- you know, she was -- she just -- during any
16  time that she had to particularly come in around the
17  medical room for whatever reason, she would stare at
18  me through the golf cart.  She would drive golf cart
19  up as if she was driving through the room and she
20  would just sit there literally in the golf cart
21  staring at me through a medication pass.
22    Q.   Uh-huh.
23    A.   And I have another nurse with me, you know,
24  and she does not do that to them.  So it's very clear,
25  you know, that something is not right on her end

Page 31

1  towards me.  So there were many incidents.  So I don't
2  know which one you're specifically speaking to as of
3  right now because there were --
4    Q.   I mean -- I'm just trying to -- I'm sorry.
5  Go ahead.
6    A.   I'm not quite sure which one you're
7  pertaining to in particular because --
8    Q.   I wasn't asking about a particular one.  I
9  was just trying to get an understanding of which ones
10  that you thought were significant enough to lead you
11  to file a written complaint.
12    A.   Okay.  Well, she was making it very
13  uncomfortable for me to do the medication pass with
14  her intimidating stares, her mannerisms.  She would
15  come in there and just sit on -- there's the bench.
16  She would sit on the bench literally, you know, and
17  she was so loud and she would be slamming doors or,
18  you know, messing with the offenders, you know,
19  causing them to get upset with her.  You know, there
20  were already challenges here.  You know, the
21  offenders, they don't come to the med room like
22  they're going to the doctor or --
23    Q.   Right.
24    A.   You know, they're fighting.  That's their
25  time to get their stuff going on.  It's their time to

Page 32

1  do -- cut up, you know.  But I learned to -- I was
2  trained -- I did take a training course from MDOC when
3  I first started.  I already had taken courses about
4  mind games.  I had already taken courses that -- and
5  Ms. Bessie had well prepared me, you know.  But you
6  still have to experience it.  So I had -- it was still
7  a challenge, you know, for me to give -- I have a
8  medication cart.  In my area, there's two windows, as
9  I explained.  There's two nurses there.  We have a
10  medication side where there's nothing but oral
11  medications mainly.
12    Q.   Okay.
13    A.   And then we have a diabetic side.
14    Q.   Right.
15    A.   Where there's insulin given.  And so there's
16  two lines formed here with the offenders coming in.
17  Well, I'm having to listen -- I have paper -- we're in
18  paper MARs at this time, medical records.
19    Q.   Sure.
20    A.   We have to, of course, document every
21  medication these offenders get.  We have to flip to
22  their name, just say it was John Doe, we have to go to
23  D and look for John.  Well, he may take six or seven
24  medications or maybe even two pages' worth.  He
25  may have -- each medication may have to be given in a

Page 33

1  specific manner.  He may need education on one of
2  them.  He may need -- he needs to hear what I have to
3  say.
4    Q.   Right.
5    A.   I have to make sure he is taking this
6  medication correctly.  I may have to take his pulse
7  rate.  He may have to have a specific number before I
8  can give him his heart medicine.  I have to take his
9  pulse ox.  I may have to give him an inhaler.  He may
10  not be able to breathe at the moment.
11    Q.   Right.
12    A.   He may have a new medication that he needs to
13  know about.  Now, I have him standing here with
14  hundreds of inmates out there cutting up, partying,
15  having a good time.  They're not just -- there's not
16  ever enough officers to run this correctly.  So I have
17  -- this is called direct observation therapy, DOT
18  meds.  At this particular time, we had DOT meds, keep
19  on person meds, which are KOPs.  So this one I have to
20  directly observe them taking.
21    Q.   You have to get the medicine, make sure he
22  takes it, document that?
23    A.   Right.  And so I may -- and then on top of
24  that, all of our medications are on a cart, and I'm
25  having to pop those medications out, different ones

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
**Lisa Crawford on 05/21/2024**

Page 34

1 two drawers -- actually, I had four drawers in the
2 beginning, two little carts here. I'm having to find
3 that medication, make sure I get the right medication
4 out of those drawers, and make sure that this man
5 understands what he's taking, make sure he takes it at
6 the right time, you know, all of my normal nursing
7 duties here that are vital. This is his life and I --
8 so when the officer comes in and starts yelling at me
9 with force or staring at me with force, which -- or
10 riding the golf cart back and forth with force, or
11 slamming doors with force, or yelling at the inmates
12 causing them discord, well, I have to maintain my
13 composure and make sure this man's okay at no cost.
14      Q.    Right.
15      A.    I still have a license from the Mississippi
16 State Board of Nursing, no matter who I work for.
17 So -- and I take that very seriously, you know. So
18 anyway, she would interrupt that. When it came to
19 interrupting and putting my patients in danger,
20 that -- you're going to get wrote up for that.
21      Q.    Right.
22      A.    Because when you enter that medical room -- I
23 understand you're an officer, you have your job to do.
24 I'm there to help these inmates, make sure they're
25 okay. They're my patients. I don't -- I'm not there

Page 35

1 to correct them. I'm not there to -- that's MDOC's
2 job.
3      Q.    Right, right.
4      A.    But if she's not doing her job correctly and
5 she's got an issue with me that I don't have with her
6 and she's going to cuss me, say -- you know, verbally,
7 she's very loud, and she made it very clear with curse
8 words she did not like me. She made racial comments
9 towards me at times, you know, and when she does that,
10 that's why I wrote her up.
11      Q.    Right.
12      A.    And she went overboard, way overboard.
13      Q.    And in terms of her doing those things, from
14 what you observed, those were things that -- those
15 actions that she was taking, she was as an officer,
16 but it was done -- the way it was done was
17 interfering with your providing the medical service?
18      A.    Yes, sir, it was. And also, you know, it was
19 interfering with, you know, my overall well-being.
20 You know, I'm -- I don't like being called those names
21 or cursed at by an officer, you know. I get all kinds
22 of stuff said to me by the inmates.
23      Q.    Right, right.
24      A.    But, you know, we're trained for that. You
25 can't be there if you're not trained for that. But

Page 36

1 not by an officer. You know, they're supposed to be
2 working with me. A proper medication call, the
3 officer would be standing there at each door and they
4 would make sure that it went well for me as well as
5 for them when we had -- and which we did when the
6 right, you know, officers were there that didn't have
7 a problem with me, it went well, because we're having
8 to give this -- on top of all that, we're having to
9 give all this medication at an extremely fast pace
10 here.
11      Q.    Right. Because you're on a time frame and
12 you've got to deal with a lot of --
13      A.    We never know what's coming up on top of
14 that. We have security issues. There may be a
15 lockdown that puts us in -- I have to always be in
16 mode to go into emergency plan.
17      Q.    Right.
18      A.    All right. It's all really in -- I get the
19 chain of command's permission, but I have to implement
20 a plan here. Okay. They're in lockdown. They have
21 to get medication. That is my job, to figure out how
22 to get it to them.
23      Q.    Right.
24      A.    You know, because I -- and this post, we're
25 the LPNs, so we're in charge here. Which anything

Page 37

1 that happens above us that is above our scope of
2 practice, we need to call the charge nurse in the
3 clinic.
4      Q.    Okay.
5      A.    But, you know, they're quite a distance away.
6 So if a patient's convulsing or is having a seizure, I
7 have to run out the door and be on guard to protect
8 his head, you know, to monitor his seizures. Anything
9 could happen. These people are sick. There's so many
10 of them. And which that did -- you know, I was
11 constantly had to put -- stop med pass, lock the door,
12 run out, and protect inmates from seizures, busting
13 their head on the concrete, falling off the bench. We
14 had diabetic patients that would go into -- their
15 sugars would be too low and they would start foaming
16 at the mouth. I had to run out there. I was the only
17 one there to make sure they were okay to get them to
18 the clinic. They couldn't -- the officers wouldn't
19 let them go. They had to be escorted or either they
20 had to be called in, and still an officer had to let
21 them in.
22      So there's quite an imminent part of danger
23 here, you know, going on at all times. I have to be
24 prepared for that. So when the officers, you know,
25 are attacking me and not helping me -- so my overall

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
Lisa Crawford on 05/21/2024

Page 38

1 well-being is very important here, is what I'm saying.
2    Q.    Yes.
3    A.    You know, because -- and when Officer Jenkins
4 was there or whatever her title was, she complicated
5 it so --
6    Q.    Right, right.
7    A.    -- unnecessarily, you know.
8    Q.    And that's what I was going to get at.  Other
9 than Officer Jenkins and her behavior either when we
10 were talking about the hallway or subsequently when
11 she was staring at you, were there any other officers
12 at MDOC who were behaving in the same way?
13    A.    Yes, sir.  During that period of time, this
14 is relatively from -- which, like I said, this is a
15 lot of information and dates, but --
16    Q.    Yeah, yeah, yeah.
17    A.    -- it's in 2020.
18    Q.    Yeah.
19    A.    There were other female officers that they
20 kind of hung together or meshed.  I don't know the
21 words for it.  But they were friends at work,
22 co-workers, whatever they were together.
23    Q.    Yeah.
24    A.    I had some issues with Sergeant Bass,
25 Lieutenant Franklin frequently.  I mean, there were

Page 39

1 times when there -- I had to write up an incident with
2 Captain Davis.  Warden Shivers was there at one time.
3 I know those for sure --
4    Q.    Okay.
5    A.    -- that I had incidents with, and they one
6 time specifically told me that it was due to -- you
7 know, they didn't want Ms. Jenkins, I guess -- because
8 if she had gotten moved away from there, she wouldn't
9 be there with them, I guess.  I don't know.  I can't
10 answer for them.
11    Q.    Right.  You wouldn't be able to know what
12 their rationale was.
13    A.    Right.
14    Q.    But they were -- you know, when you speak
15 about Franklin, Lieutenant Franklin, and Sergeant
16 Bass, those, again, were MDOC employees?
17    A.    I believe, you know, because, like, there are
18 government -- there's a CID force.  There's a K-9
19 force.
20    Q.    Right.
21    A.    Now, I don't know --
22    Q.    There are other -- there may be other
23 entities or agencies on --
24    A.    They're not VitalCore or Centurion employees
25 as far as I know.

Page 40

1    Q.    Right.  That's what I was getting at.
2    A.    Yes, sir.
3    Q.    Okay.  But in terms of those complaints with
4 those ladies, were those things that you also, kind of
5 in the same way you brought up the first incident to
6 Ms. Bessie, were those incidents also brought to her
7 attention, as well?
8    A.    Yes, sir, they were.
9    Q.    Okay.  Let me fast forward a little bit.  At
10 some point, Centurion changed to VitalCore.
11    A.    Yes, sir.
12    Q.    I think that was -- I don't remember the
13 exact date.  Sometime in, I want to say, May 2020; is
14 that right?
15    A.    I believe -- I believe I signed one in
16 October.
17    Q.    May have been a little later.  Maybe October.
18    A.    I'm thinking October, but, you know, it was
19 2020 for sure.
20    Q.    It was sometime in 2020, for sure?
21    A.    Yes, sir.
22    Q.    Yeah.  Okay.  When that transition was made
23 from Centurion to VitalCore, did your personnel on the
24 medical side change at all?
25    A.    It did, yes, sir.

Page 41

1    Q.    Okay.  How did it change or who did it change
2 to?
3    A.    Ms. Bessie stayed as my supervisor in the
4 beginning.  We lost a lot of nurses.  A lot of nurses
5 did not -- from med distro, our health care -- a lot
6 of our med distro nurses did not stay with the change
7 --
8    Q.    Okay.
9    A.    -- from Centurion to VitalCore.  They -- a
10 lot complained about the benefits and the pay, and I
11 was just shocked a lot of them left, and a lot of
12 nurses that had been this a long time.  You know, I
13 can't answer why they left.  I just now they did.  And
14 they had voiced, you know, some of their concerns at
15 meetings.  Ms. Lampkin was still there and Mr. Page in
16 the beginning, as well.  But now, it continued to
17 change, you know, but this in the beginning of it, it
18 stayed with Ms. Bessie as supervisor, Ms. Lampkin as
19 HSA and Mr. Page was there, as well, as HSA.
20    Q.    Okay.
21    A.    But it did -- after that, it continually
22 changed.  VitalCore struggled to get their chain of
23 command and their --
24    Q.    Staffing?
25    A.    Right.  They really did.

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
**Lisa Crawford on 05/21/2024**

Page 42

1    Q.   Okay.

2    A.   But it changed drastically.  It became
3  drastically where it was so few nurses, so -- I'm
4  getting ahead.  I'm sorry.

5    Q.   That's okay.  I know it's a lot of --

6    A.   It really is.

7    Q.   -- detail and a lot of things, a lot of stuff
8  going on, and it was four years ago.

9    A.   Right.

10    Q.   I understand.  Going back to your charge with
11  the EEOC, I know we talked about the sequence of you
12  letting people, for lack of a better term, at Central
13  Mississippi know what was going on in terms of
14  Ms. Jenkins and Franklin and Bass.  Was there ever a
15  time that you elevated those complaints?  (Audio
16  transmission failure.)

17    A.   Your computer has froze up.

18         MR. NORRIS:  I'm glad that -- I thought that
19  was me.

20         THE WITNESS:  I didn't hear anything you
21  said, sir.  You completely went out.

22         MR. NORTHINGTON:  I'm sorry.  I got a little
23  thing saying my internet connection was unstable.  So
24  let me ask it again.

25  BY MR. NORTHINGTON:

Page 43

1    Q.   Was there ever a time that, you know, we
2  talked about the complaints that you made at Central
3  Mississippi going through Ms. Bessie.  Was there ever
4  a time when you had to elevate those complaints beyond
5  Central Mississippi, like, to Department of
6  Corrections, itself, or personnel at DOC, yourself?

7    A.   There was one incident where Ms. Bessie
8  wasn't there at that date because, on weekends, she
9  might not be there.  We might have to -- whoever is in
10  charge as far as charge nurse that day, that may be
11  who we had to -- if we had an issue as far as a
12  medical emergency, and we always have her cell phone
13  number if she's not there.  So I'm not sure if
14  Ms. Bessie was there this particular day, but I went
15  to -- me and my partner, Nurse Adams, we had went to
16  the restroom to go -- well, I had -- I mean, we're
17  kind of skipping over an incident that happened with
18  an offender, but what particularly took me over her
19  was when we went to -- we were going to the restroom,
20  because it's quite a distance, again, from -- we have
21  no restroom in our med distro room.

22    Q.   Right.

23    A.   So once again, we're there, you know, from
24  5:30 in the morning.  We're locked in there with no
25  restroom, no access to anything.  We're locked in.  So

Page 44

1  it's -- when we go to the restroom, it's quite a
2  complicated process.  We have to lock the doors, make
3  sure everything -- and go all the way to the 720
4  clinic unless there is an officer there that day that
5  can open up the hallway next to us, which has offices
6  down in it, and it's back behind the shift man.  They
7  will open it and let us go use those restrooms.

8    Q.   Okay.

9    A.   And so at this time that we were headed out
10  to the restroom, Nurse Beverly went in first and she
11  went to the restroom, but I was told I couldn't go to
12  the restroom by the young lady who was opening the
13  door.  She told me, "I'm sorry, Ms. Crawford, it's not
14  me."  And so I went to the shift command and I asked.
15  Well, they were sitting outside.  It was Captain
16  Davis, I believe it was Warden Shivers, and Sergeant
17  Bass.

18    Q.   Okay.

19    A.   They were there.  And I told them I would
20  like to know why I can't go to the restroom.  Warden
21  Shivers, you know, she looked at them.  She was like,
22  you know, "What's going on?"  We went inside to talk
23  about into the shift command office and I told Ms. --
24  Warden Shivers what the lady had said.  Well, of
25  course, Captain Davis said she didn't -- that was not

Page 45

1  true, and Sergeant Bass, they acted as if it were not
2  true.  But Warden Shivers called the young lady that
3  was working in shift command in the -- to come in
4  there, or she was working the gate, and she -- control
5  tower.  She came down, came in there, and I stepped
6  out.  And when I came back in, Warden Shivers had
7  said, you know, she did confirm that she was told not
8  to allow me to go to the restroom in that particular
9  hallway.

10         So I said, well, you know -- then Captain
11  Davis said, you know, "Well, you're always writing
12  people up.  You're always, you know, messing with
13  Melissa," or Ms. Jenkins, Melissa Jenkins, "You're
14  always messing with her.  You're always trying to
15  start something."

16         I said, "No, ma'am, I'm not."  I said, "I
17  just need to go to the restroom.  What does that have
18  to do with me going to the restroom?"

19         You know, she just kept on saying I was, you
20  know, basically a problem, you know, writing people
21  up.  And I expressed, you know, that's not my goal
22  here at all.  I just want to go to the restroom.
23  Well, it didn't get worked out where I -- I just -- I
24  went out of there and went into the clinic to go to
25  the restroom.  I just did not go down the same hallway

LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC
Lisa Crawford on 05/21/2024

Page 46

1  as Ms. Adams.
2          So I came back to the -- we went back to the
3  med distro room, you know, and I was very upset about
4  that at this point, and, you know, Ms. Adams is, too.
5  She doesn't like that.  And she doesn't like, you
6  know, mistreating me that way and discriminating like
7  that.  So I went myself.  I knew I couldn't make it
8  through that day with -- because they were on duty.  I
9  was going to have to deal with them for the rest of
10  that entire day, sometimes --
11      Q.   Right.
12      A.   -- you know, we're there until 8 or 9:00 at
13  times, but our -- of course, our time to get off is
14  5:30.  That rarely happens.
15          So I went to Superintendent King's office.  I
16  walked over there.  Or no, I walked to my car and
17  drove over there.  So -- which, you know, you have to
18  have an appointment to see Superintendent King, but
19  I --
20      Q.   Sure.
21      A.   -- just went.  I walked up to his office and
22  I asked his secretary would he be willing to speak to
23  me, and I went in to speak with him and I told him
24  what had happened, you know.  And he just listened.
25  You know, he asked -- he doesn't know both sides, so

Page 47

1  he's just listening.
2          Well, you know, he did express, he knew that
3  we had had problems in the past and, you know, and he
4  had asked me, "Would you be willing to move to another
5  location," you know.
6          And I told him, I said, "No, sir, I don't
7  think that I should have to move from my location
8  because, you know, they don't like me.  I don't bother
9  them.  I don't have anything against them, except what
10  they're doing here at work.  We're at work.  Whether
11  you like me or not, we're here at work.  You put that
12  aside."
13          You know, he agreed.  We talked about that.
14  And at this time, there is still an issue with an
15  offender that had messed with me down the hallway of
16  that same bathroom.
17      Q.   Right.
18      A.   We had a -- I had an incident there with him
19  and it was quite a process with him.  And I told him,
20  you know, I said, "I've been through this" -- I
21  basically told him, you know, "I've been through this,
22  the racial discrimination, the write-ups with
23  Ms. Jenkins," you know.  And I said, "On top of that,
24  you know, they've left an offender there for quite a
25  few months," which, again, was a huge process of, you

Page 48

1  know, threatening my life at times.
2      Q.   Yeah.
3      A.   And he said -- and I said, "And he was
4  supposed to have been moved."  And I said, "I went
5  through quite an ordeal with that."
6          And I said -- he said, "Which offender," you
7  know, because he didn't have his records in front of
8  him.
9      Q.   Sure.
10      A.   And I said, you know, John Smith, which he's
11  also known as X Man.  He knew him by X Man because
12  he's been there a long time, this offender.  And he
13  said, you know, "X Man here?"
14          I said, "Yes, sir."
15          And he said -- you know, he just said okay.
16  It was as if he noted it was there.
17          You know, he told me, you know, he would look
18  into this.  You know, I'm not quite sure of every word
19  there that went on, but he did assure me he would look
20  into it.  So that's when I went above Ms. Bessie, that
21  day.
22      Q.   Okay.  Okay.  Now, I know you referenced it
23  and I understand it's kind of hard to explain.
24      A.   Uh-huh.
25      Q.   But I want you to do the best you can.  What

Page 49

1  about those incidents with Jenkins and Bass and
2  Franklin, what about those incidents made you think
3  that what was going on was based on racial
4  discrimination?
5      A.   Well, they told me.  You know, they told me
6  straightforward that -- well, I would believe, you
7  know, being called a white bitch or a white dog or --
8  there were all kinds of -- Britney Spears wannabe,
9  kind of, you know, they -- you don't belong here, why
10  are you here, you need to be at a nursing home or, you
11  know, a children's clinic, you don't need to be here,
12  you don't -- I mean, they made it clear with, I
13  mean -- you know?
14      Q.   Uh-huh.
15      A.   There were comments about Rosa Parks, you
16  know.  I love Rosa Parks, but that's not what they
17  were referring to, you know.  But mainly that.  I
18  mean, they called me a white bitch, you know, white
19  dog.  I was often called that and --
20      Q.   Did you ever get the sense that anybody at
21  Centurion was, for lack of a better term, condoning
22  those actions or allowing that behavior to happen?
23  Like, for example, let me give you an example.  So,
24  you know, we talked about how you brought the initial
25  incident with Jenkins and the door in the hallway to

LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC
Lisa Crawford on 05/21/2024

Page 50

1  Ms. Bessie's attention.
2      A.   Right.
3      Q.   **Did you ever get the sense that, when you**
4  **would bring this stuff to Ms. Bessie's attention, that**
5  **she wasn't doing anything about it or wasn't getting**
6  **it addressed in some way?**
7      A.   No.  She -- Ms. Bessie did not like it.  At
8  one point after one of the incidents, I had asked
9  Ms. Franklin, Officer Franklin, Lieutenant Franklin --
10 they changed frequently with their titles here.
11     Q.   **Yeah, yeah.**
12     A.   They've got ranks and it was -- I couldn't
13 keep up with all that.  Well, she was coming into the
14 hallway and then she would -- I mean, she had followed
15 me down the hallway, she had -- that -- after that
16 incident with the inmate, those three women, well,
17 Lieutenant Franklin and then Sergeant Bass and
18 Jenkins, I didn't have that -- I mean, Captain Davis
19 was, you know, just sometimes.
20         But that bathroom became an issue that day.
21 She followed me down that hallway.  She beat on the
22 door while I was just trying to use the restroom, made
23 me very uncomfortable, you know, and asking me, what
24 are you doing in there, why are you in there, you
25 know, just things like that.  And, well, at one time,

Page 51

1  she came into there and she was telling me, "hurry it
2  up, Nurse," you know, "You're going too slow," and
3  things like that.
4          Well, I'm trying to -- once again, they would
5  say that I was talking or spending too much time with
6  the inmate.  No.  You don't know what medicines I'm
7  giving him.  Once again, he might have to understand
8  this.  His heart could stop if it's the wrong rate.
9  And she would just pick, pick like that, and I told
10 her, please, you know, stop, just -- and I would, most
11 of the time, try to ignore it.
12     Q.   **Uh-huh.**
13     A.   She said -- this particular time, she said,
14 you know, "You don't belong here," but she didn't say
15 it -- I can't say it like she did.  It was a very loud
16 verbal tone and I can't --
17     Q.   **I understand.**
18     A.   Yeah.  So it sounds like she's been saying it
19 nicely here, but it's not.
20     Q.   **Gotcha.**
21     A.   You know, she's yelling it loudly, you know.
22 "Move along.  You don't belong here."  And she's
23 calling me a white bitch again.  And when she did
24 that, I said, "I'm going to call my supervisor."  When
25 she called -- whatever she said, after I said I was

Page 52

1  calling my supervisor, she said she didn't give a
2  fuck, she was in charge there, and I guess she didn't
3  really think that I would.  Well, I did call
4  Ms. Bessie and I told Ms. Bessie, and Ms. Bessie
5  actually got up from her office and came down there.
6  She had had enough.
7      Q.   **Okay.**
8      A.   And she came there herself and she came and
9  got me, made sure I was okay, I was -- well, I mean,
10 for her to go with her, we went to shift command and
11 she addressed them about this whole thing, and she
12 told them this is -- she's a nurse here.
13     Q.   **Right.**
14     A.   And you -- this is her job here, you know,
15 she's doing her job, and she said other things, but
16 she was -- and Lieutenant Franklin would say, "Well,
17 that nurse.  That nurse."
18         And Ms. Bessie looked at her and she said,
19 "That nurse has a name.  Her name is Nurse Crawford."
20 She stood in for me and told them don't call me any
21 more names, it's Nurse Crawford.  So, yes, Ms. Bessie
22 did not, you know, allow that, and she was upset about
23 it.  So I wrote that up as a report, too, which she
24 told me to.
25         MR. NORTHINGTON:  Right, right.

Page 53

1          Okay.  Do you mind if we take a five-minute
2  break?
3          (Discussion had off the record, not
4  reported.)
5          (Recess.)
6  BY MR. NORTHINGTON:
7      Q.   **Ms. Crawford, we were talking a little bit**
8  **before about some of the incidents that occurred with**
9  **regards to Central Mississippi, and Franklin, and**
10 **Bass, and Jenkins.**
11     A.   Uh-huh.
12     Q.   **What I'd like to do now is talk a little bit**
13 **more in detail about the timing of your EEOC charge.**
14     A.   Okay.
15     Q.   **And I know, initially, you filed the charge**
16 **just against Mississippi Department of Corrections; is**
17 **that correct?**
18     A.   I'm not sure what -- who all was in that
19 complaint.
20     Q.   **Okay.  At some point -- I think the date on**
21 **the original charge was in November of 2020, and then**
22 **later, you brought in VitalCore in an amended charge,**
23 **and that was in 2021.  Does that sound familiar?**
24     A.   I know I filed the original with the EEOC in
25 '20, towards the end.  I know the amendment came

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
**Lisa Crawford on 05/21/2024**

Page 54

1 after.
2    Q.    Okay.
3    A.    As far as the date, I'm not certain at this
4 moment.
5    Q.    That's fine.  How did you go -- what was the
6 reasoning or rationale for amending the complaint to
7 bring in VitalCore?
8    A.    Well, as far as I remember, you know,
9 without -- you know, I haven't looked at my records.
10    Q.    That's fine.  I understand.
11    A.    There came a time where, you know, it wasn't
12 being stopped, it wasn't being dealt with, you know.
13 So with the EEOC I was dealing with, you know, I
14 believe her name was Carleen Collins, I believe she
15 was -- yes, she was my worker.  And then I started
16 having incidents from VitalCore employees there, as
17 well.
18    Q.    Okay.
19    A.    So, you know, I'm not sure if it was at that
20 point it happened in that amendment, but I did start
21 receiving some issues with our -- with my co-workers,
22 you know, as far as medical side, as well.
23    Q.    Well, that's kind of what I want to get at
24 now, ask you some specifics about it.  But before I
25 get into that specifically, when Centurion made the

Page 55

1 change to being -- I mean, when Central Mississippi
2 made the change from having the medical taken care of
3 by Centurion to VitalCore, was there any conversation
4 that you had with specific new VitalCore people about
5 the prior issues that you had with Department of
6 Corrections?  Like, I know Ms. Bessie was still there.
7    A.    Yes.
8    Q.    So she wouldn't count because she was
9 involved.  But was there anybody, like, in upper
10 management at VitalCore, that once VitalCore came on
11 and was in charge, that you brought the prior
12 incidents up to them?
13    A.    Let me think.
14    Q.    Okay.
15    A.    I had a phone conversation with Mr. Mallett.
16 I know we had talked about Ms. Lampkin and I'm not
17 sure if this specific one, if this was the first time,
18 but this is what's coming right now --
19    Q.    Okay.
20    A.    -- to my mind as far as that goes.  Like I
21 said, we had a huge amount of staff leave shortly
22 after VitalCore took over.  So through the end of
23 2019, 2020, I believe somewhere in there, we had to
24 end up bringing in contracted nurses from somewhere
25 else that were just working contracted to us.  And at

Page 56

1 some point, Ms. Adams was -- had had enough of the --
2 it had gotten really -- with all the hostility and,
3 you know, she had just, you know, she didn't like it.
4 It had gotten too much for her.  She was fixing -- she
5 was going to leave sometime at the end of -- in 2020
6 year.
7    Q.    And Ms. Adams was the other nurse that was
8 working with you in med distro?
9    A.    Right.  Yes, sir.  She was my main partner.
10    Q.    Okay.
11    A.    She had actually had a partner herself.  She
12 was brought in with her own partner, Nurse Knight.
13 Originally, she was supposed to be opposite -- I was
14 training them to work opposite my shift because we
15 didn't have -- we had lost some employees.  Well,
16 Nurse Knight did not stay, as well, because of the
17 hostility with -- because it had gotten in with -- the
18 hostility from the offender, John Smith, and the
19 officers from that.  Well, that was an issue.  And I
20 remember they did not want Ms. Adams to leave and
21 Ms. Lampkin had come down, and it was with Mr. Peters.
22 Now, I don't know at what point he became the HSA
23 assistant or what his title is here because we had
24 some major, like, our higher-ups change --
25    Q.    Right.

Page 57

1    A.    -- and command, too, at some point.  So they
2 had come down to ask Ms. Adams to stay and not leave,
3 and they told her that, you know, they would assure
4 her that she would be able to be stationed at 720
5 because, again, it's two nurses there and, you know,
6 that's always a better thing than being alone at
7 another facility by ourselves.
8    Q.    Okay.
9    A.    Not facility, but another area.
10    Q.    Location, yeah, yeah.
11    A.    And so then Ms. Lampkin and Mr. Peters called
12 me in back there and told me that, you know, there
13 would be changes now to the schedule and that I would
14 be moved from 720.
15    Q.    Okay.
16    A.    You know, so, you know, I didn't think that
17 was very fair.  You know, I had been there a lot
18 longer than Ms. Adams and, you know, I didn't -- I
19 didn't argue with her, of course, but I was just
20 saying that that was an issue with me, as well.
21    Q.    Okay.
22    A.    And it started moving --
23    Q.    So -- I'm sorry.
24    A.    That started -- sir?
25    Q.    I didn't mean to interrupt you.  I'm sorry.

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
Lisa Crawford on 05/21/2024

Page 58

1    A.   Oh, it's okay.  I just know there started to
2    come changes there with that, and I remember, you
3    know -- well, I mean, I had a talk with Mr. Mallett on
4    the phone, and he had had other issues this -- you
5    know, I don't know if I'm even supposed to talk about
6    that because we --
7        Q.   Before you get to that, let me ask you a few
8    more questions about the prior and the change in your
9    schedule.  Did Ms. Lampkin or Mr. Peters give you any
10   indication as to why the schedule change was being
11   made or what the rationale was for it?
12       A.   I don't recall the exact -- they didn't say
13   an exact reason and, you know, it wasn't a very
14   pleasant, you know, atmosphere, whatever reason it
15   was.  You know, when I expressed to her, you know, I
16   would like to stay in this area -- because, you know,
17   we have to know -- like I said, we already have the
18   offenders and it was -- I could go to any area and
19   work.  We were trained to do that at times.  But when
20   you have to move me to a whole new area, I've got a
21   whole new group of people to learn, and that's -- I've
22   learned this area, I've learned to, you know, have my
23   patients.  If something's going wrong with them, I'm
24   kind of familiar with their sicknesses, you know, and
25   I liked it there.  I liked the area I was in.  So I

Page 59

1    didn't understand, you know, why Ms. Adams could stay,
2    but I had to go.
3        Q.   Was the --
4        A.   And they did not tell me why.  I mean, she
5    did not say.
6        Q.   Okay.  In terms of the change that you were
7    being asked to make or being directed to make, other
8    than the difference between you and Ms. Adams, you
9    know, you being there longer, was there any material
10   difference or any specific difference in your job that
11   changed from the change in schedule?
12       A.   Well, it became a lot of extra duties in the
13   process of this because we were shorthanded.
14       Q.   Okay.
15       A.   We became real shorthanded.  And I was --
16   ended up filling the duties of a lot -- in all areas.
17   You know, I was pulled to all areas and I had an
18   extreme amount of work on me because those medical
19   records in 720 -- like I said, we had over 720
20   patients.  You know, there were hundreds and hundreds
21   of documents that -- medical records had to be
22   handwritten each month, at the turnover of each month,
23   and, you know, and I'm in -- there's no one there to
24   assist me or not enough people there.  Normally,
25   it's -- if we have a full rotation, there's two on the

Page 60

1    opposite rotation of me and Ms. Adams or whomever I'm
2    working with.  They're not there to do their part of
3    this -- 720 is the largest area there is and so I
4    ended up having to take that on myself to make sure
5    all of that was done, and also be pulled to other
6    areas.  And I know there was a meeting that we had by
7    Mr. Peters, too, and in at that meeting, I think
8    Ms. Bessie has passed away at some point --
9        Q.   Okay.
10       A.   -- unfortunately, which was very hard for all
11   of us.  And we're having a meeting, and there's a --
12   he's up there talking and there's a -- Nurse Barlow is
13   her name.  She's in that particular meeting.  And, you
14   know, at some point -- I mean, I'm in the back.  I
15   haven't even, you know, spoken to her or looked at her
16   or anything.  You know, she stands up in the meeting
17   and demands that I leave 720.  I mean, this is in
18   front of everyone.
19       Q.   Did you know who Ms. Barlow was at the time?
20       A.   I did.  She --
21       Q.   Had you worked with her before?
22       A.   Yes, sir.
23       Q.   Okay.  Was she a nurse like you?
24       A.   She was a nurse, yes, sir.  She's an LPN.
25   She's another med distro nurse, but she mainly had

Page 61

1    worked in the other areas, so we didn't -- she was
2    very -- she did not like me, either.  She made it
3    clear.  So we did not work together very often.
4    Ms. Bessie -- Ms. Bessie knew the situation, so she
5    kind of placed people not just on my side but on every
6    side that were compatible wherever they were working.
7    She tried to do that to the best of her abilities.  So
8    me and Nurse Barlow were not together very often.
9        But after Ms. Bessie passed away, things kind
10   of changed and, well, at that particular meeting, for
11   whatever reason, she stood up and demanded that I
12   leave 720, you know.  And that was horrific in front
13   of all my co-workers, you know.  And I take very much
14   pride in my character, my work ethic, and that really
15   was a, you know, very huge turning point for me
16   because, not only did Mr. Peters agree with her, or I
17   don't know if he -- in that meeting, but he did not in
18   any way make her stop talking to me like that.
19       Q.   Okay.
20       A.   Make her sit down.  He didn't tell her in any
21   way to stop disrespecting me.  And I mean -- and on
22   top of that, he left right out of there and changed me
23   off the schedule to out of 720.  That happened, as
24   well.
25       Q.   I was just about to say, was that change part

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
**Lisa Crawford on 05/21/2024**

Page 62

1  of the original discussion that Ms. Lampkin had with
2  him or was --
3      A.   No.  This was all worked -- but I don't know
4  what they had going on behind, you know, but I do know
5  it happened, you know, close together.
6      Q.   Okay.  Okay.  Is there any reason to think,
7  from your perspective, that -- I know you described
8  that, when the schedule change was made, you'd be
9  taking on more responsibilities.  But from your
10 perspective, is there any reason to think that you
11 might have been given those responsibilities because
12 you had been there longer or because you had more
13 experience?
14     A.   No.  No, sir, because that was too much.  It
15 was too much work.  And, you know, it put an extra
16 pressure on me, and it was very hard, and I know, for
17 a period of time, I didn't have a co-worker, and I had
18 to work alone, and I was doing that by myself and --
19 so, no, I don't think it was because of that.
20     Q.   I guess the question I have was because --
21 and you may not know the answer, but if they're moving
22 you or making a schedule change to a new position,
23 were you being moved to replace someone who had left,
24 or was it just a personnel shift?
25     A.   No, sir.  No one else got moved.  Everybody

Page 63

1  else stayed there, you know.  In the other area, when
2  it comes down to -- like I said, there's a lot of
3  information here that this is a long time ago and a
4  lot of things happened, because with our shift change
5  and, like I said, we're -- over at 720, we're kind
6  of -- I'm not -- I haven't always been called to every
7  meeting, is what I'm trying to say.  It could be on
8  opposite rotation.  I'm not around the administration
9  a whole lot, so I can't answer for what was going on
10 on their side at this point, but I know that, you
11 know, I had expressed that it was too much work, but I
12 still did it because of my commitment to my job and to
13 the duties I have as a nurse.
14          But one of the -- the only other nurse that I
15 know that had -- that we were there at the same time
16 that stayed with VitalCore through the whole thing was
17 Nurse Danzler, and she had caught -- it was kind of
18 like on the yard, it was the females, but they kind of
19 had a similarity of, like, the 720 clinic, but it was
20 males.  And then there are many other areas where
21 you're alone.  But Nurse Danzler had -- she was kind
22 of like -- she ran her area and I ran 720 kind of, but
23 we would move anywhere in need and help, but we
24 were -- you know, we could come in and handle that
25 situation in our area if we're more familiar with it,

Page 64

1  and plus, you know, I had been stationed there.
2      Q.   Right.
3      A.   She was never moved from her stationary
4  position, and I have no -- nothing -- I like
5  Ms. Danzler.  I have nothing against her.  But she
6  remained in her position unmoved and, you know, I
7  didn't think that was --
8      Q.   Is Ms. Danzler still there, to your
9  knowledge?
10     A.   I do not know.
11     Q.   Do you remember her first name?
12     A.   Sherry.
13     Q.   Sherry?
14     A.   Uh-huh.
15     Q.   Only reason I ask is I didn't remember seeing
16 her name in any of the documentation, so I wasn't
17 sure.
18     A.   Like I said, there's a lot that goes on that
19 I didn't write up.  You know, I couldn't write this
20 whole entire thing, but there's a lot that's going on
21 here, you know, that's affecting this whole situation,
22 as well.
23     Q.   Yeah.  So from your perspective -- I mean,
24 was Ms. Danzler also LPN?
25     A.   She was.

Page 65

1      Q.   Okay.  And in terms of her job
2  responsibilities, you would characterize them as being
3  similar to yours?
4      A.   They were.  The yard was similar in the way
5  it was ran except for there were less patients.
6      Q.   Okay.
7      A.   I think there might have been -- I can't say
8  how many women there were, but it was at least -- I
9  had at least 4- or 500 more patients.
10     Q.   Okay.  Ms. Danzler, is she a black female?
11     A.   She is.  I'm the only white female through
12 this whole situation, as well, in my -- in the LPN med
13 distro.
14     Q.   Okay.
15     A.   We mainly had LPNs in med distros.  Most of
16 the RNs were in the clinic.
17     Q.   Right.
18     A.   But there were times they did come and work
19 with me.
20     Q.   Okay.
21     A.   Or wherever they were needed.
22     Q.   I know in the complaint there is a reference
23 to Nurse Adams agreeing that the schedule change was
24 motivated by an effort to get you to resign; is that
25 accurate?

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
**Lisa Crawford on 05/21/2024**

Page 66

1    A.   I can't remember her exact words, but she did
2  feel that way.  You know, I'm not sure exactly that
3  there was a lot happening at that moment, but she did
4  feel that they were trying to get me out of there.
5  She did feel -- she did feel that -- she felt, from
6  her point of view, her expressions to me, you know,
7  which I can't -- she can speak for herself.
8    Q.   Sure.
9    A.   But she expressed to me that, you know, they
10 didn't want me there and she -- you know, it was very
11 noticeable and very un- -- because they didn't do that
12 to her.  Like, even the officers, they didn't treat
13 her that way, you know.  And it was very clear and
14 notable that there was something going on here that
15 wasn't just -- it wasn't -- and I wasn't doing
16 anything to them, period.
17   Q.   Uh-huh.
18   A.   Like I said, I had -- I value my work ethic.
19   Q.   Do you remember Nurse Adams -- I know you
20 said she can speak for herself, but do you remember
21 her saying specifically or mentioning anybody
22 specifically at VitalCore representing that to her or
23 suggesting to her that, yes, Crawford needs to go, or
24 anything like that, or is it just her general sense
25 about what was going on?

Page 67

1    A.   She had heard things.  She had heard her
2  herself at times.  There was a time she had heard in
3  the clinic or somewhere between our room and the
4  clinic, she had heard that -- the female officers
5  talking, the black female officers, and she had heard
6  them talking to even the offenders at the time that
7  they had not moved, you know, saying they need to get
8  that white nurse out of there.  I was often referred
9  to as that white nurse, as well, that white nurse, in
10 front of Ms. Adams.  And there were times she said
11 that and then, like I said, whenever Ms. Lampkin and
12 Mr. Peters came, it was not a friendly vibe from them.
13 It was very notable even to Ms. -- because when I came
14 out of there, Nurse Adams was sitting in her area, and
15 she looked at me and she shook her head, she said,
16 "It's not good, Crawford," you know.
17   Q.   When you say it wasn't a good -- I want you,
18 to the best you can, I want you to tell me what you
19 mean by that.  What was being done to make you feel
20 that way?
21   A.   She directly told me that there would be a
22 schedule change in a tone that you're not going to
23 argue back, and I understood it, so I didn't, you
24 know.  I'm not going to, of course, disrespect my boss
25 in any kind of decision she makes, you know.  I might

Page 68

1  not like it, I might have to deal with it, but I
2  didn't disrespect her at the moment, you know, and
3  argue with her or anything.
4    Q.   Did you think she was being disrespectful
5  towards you in how she conveyed that change?
6    A.   Yes, sir.
7    Q.   Okay.  Do you think the way she was conveying
8  the change to you was a result of some kind of racial
9  bias or do you think it was just her being, for lack
10 of a better term, assertive in the position so that it
11 would be conveyed to you that there was no moving or
12 no change that was going to be made?
13   A.   I cannot speak for her motive.
14   Q.   Okay.
15   A.   I do not know.
16   Q.   And the reason I ask is because, you know,
17 in a situation like that, in that situation, you
18 didn't -- did you go into the meeting thinking that it
19 was something that was going to be discussed and you
20 were going to work it out, or was your understanding
21 that this is how it's going to be and there's no
22 debating about it?
23   A.   This is how it's going to happen and there is
24 no debating about it.
25   Q.   Okay.

Page 69

1    A.   But I had hoped to go to the meeting to have
2  my voice heard.
3    Q.   Gotcha.
4    A.   I was kind of excited, you know, to have
5  some -- a chance, because I didn't get called to very
6  many meetings.  So I was kind of excited to voice, you
7  know, with the changes or whatever, just to be able to
8  speak, you know, freely.  And I thought that time
9  might come, but, of course, it did not.
10   Q.   Okay.  Okay.  Once that change happened, was
11 there anything else, from your perspective, that led
12 you to move forward with the EEOC complaint?
13   A.   Well, I needed help.  You know, I needed help
14 and no one was helping, you know.  It was like it got
15 worse.  It kept getting worse instead of better.
16   Q.   Okay.
17   A.   You know, that's the only reason I went to
18 the EEOC in the first place, you know, because it just
19 wouldn't stop, and it kept getting worse.
20        And I genuinely had found the nursing field I
21 loved as an LPN.  You know, I liked corrections.  The
22 schedule worked well for me.  It was within a good
23 drive for me.  The 3/2 rotation worked perfect for me
24 as far as work with my family.  Planning my -- I could
25 plan anything.  I had my calendar.  I was, you know --

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
**Lisa Crawford on 05/21/2024**

Page 70

1  I felt safer with two nurses than one, which I'm okay
2  with working -- I've worked the whole -- every area by
3  myself, so -- but I liked -- I liked where I was and,
4  you know, like I said, they just wouldn't stop, you
5  know.
6        It was that I wasn't being heard or something
7  wasn't being done, and I can't answer who's not doing
8  what.  That's the big thing here, is you've got so
9  many people involved and I don't know who is working
10  with who.  I know I'm reporting to the proper
11  authorities and the proper people.  I mean, I had -- I
12  did report it to -- we didn't talk about the incident,
13  but Warden Miller, he was -- I had reported to him at
14  times.  I had conversations with him.  I had reported
15  to Jeworski Mallett, deputy commissioner.
16       **Q.  Did you --**
17       A.  I reported to him.  And as a matter of fact,
18  the female officers, Smith, she was the one who helped
19  me send that e-mail to him because I didn't have his
20  e-mail address, and she knew.  She told me, "Crawford,
21  you're being racially discriminated against.  That's
22  what this is coming from," you know.  So she helped,
23  showed me where to go because I didn't know where to
24  go to, where else.  So I went to them for help.  So I
25  don't know if what they did, if they did what they did

Page 71

1  or didn't work out.  I can't answer that.  So I just
2  know that I went to the EEOC for help and it didn't
3  work out from there, either.
4       **Q.  Okay.  And I guess that's what I'm kind of**
5  **getting down to in terms of things that VitalCore was**
6  **doing versus things that the Department of Corrections**
7  **was doing --**
8       A.  Right.
9       **Q.  -- that led you to add VitalCore to the**
10  **charge.**
11       A.  Uh-huh.
12       **Q.  And I'm trying to make sure I understand a**
13  **sense of what it was that VitalCore was doing outside**
14  **the issue with your schedule change, if there was**
15  **anything in particular that personnel of VitalCore was**
16  **doing, whether it was the HSAs or other nurses or, you**
17  **know, somebody else in some other position at**
18  **VitalCore that was doing that you felt was racially**
19  **discriminatory or, you know, creating an environment**
20  **that was hostile for you.**
21       A.  Well, like I said, I mean, I -- and this is
22  general information here.  You know, I don't know
23  which year we're talking about here because it went
24  from '20 to '21 to '22 to '23.
25       **Q.  Right.**

Page 72

1       A.  So I don't know which area or which
2  particular incident that I wrote up that was enough
3  for me to do that.
4       **Q.  Right.**
5       A.  I'm not sure.
6       **Q.  VitalCore came in in the fall of '20.**
7       A.  Uh-huh.
8       **Q.  So it would be something, at least in terms**
9  **of VitalCore, something they would be involved in**
10  **going forward.**
11       MR. NORRIS:  Hiawatha, it's not necessarily
12  that.  I can let you know, it was -- the charge was
13  initially filed against MDOC because we thought they
14  were the employer.
15       MR. NORTHINGTON:  Right, right.
16       MR. NORRIS:  And MDOC came in and said, no,
17  we're not the employer.  So we amended to include
18  VitalCore because they're the employer.
19       MR. NORTHINGTON:  Because they were the
20  employer.  I got it.
21       MR. NORRIS:  Right.  It's not that an action
22  happened in between those two things.
23       MR. NORTHINGTON:  Okay.
24       MR. NORRIS:  It was just that we found out
25  that VitalCore was the actual employer.

Page 73

1       MR. NORTHINGTON:  Right.  Okay.  And that's a
2  little bit clearer.
3       MR. NORRIS:  Yes.
4  BY MR. NORTHINGTON:
5       **Q.  And I guess, Ms. Crawford, what I'm trying to**
6  **understand from you is that, you know, which one of**
7  **VitalCore's employees versus, you know, other**
8  **employees would have been involved in what you allege**
9  **to be discriminatory activity?**
10       A.  Well, like I said, you know, there were
11  issues with -- from even 2019 as far as the women not
12  wanting to work with me in the med distro, but
13  Ms. Bessie was there.  You know, she kept that at bay
14  and she moved people around to work with me that
15  weren't, I guess, weren't racially discriminatory or
16  they would be willing to work to with -- for whatever
17  reason.  Like, I can't answer for everyone, but I was
18  treated differently.
19       **Q.  Yeah.**
20       A.  And she had to schedule people and, you know,
21  like I say, I can work with anyone because we're at
22  work and, well, I don't have, you know, that in my
23  heart against anyone anyway, but -- so it wasn't just
24  MDOC, you know.  It was on both sides.  But when
25  Ms. Bessie passed, you know, whatever those nurses

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
**Lisa Crawford on 05/21/2024**

Page 74

1  that were left, you know, all I know is that it was
2  not easy for me on both sides.  It had become -- I
3  mean, it just gets into extremely, you know, different
4  conditions.
5      Q.   Okay.  Once VitalCore took over for
6  Centurion, was there any kind of procedure or meeting
7  process that you followed specifically with VitalCore
8  with regard to the racial discrimination claims that
9  you had?  Like, just to give you an example, I know we
10  talked about previously you bringing issues to the
11  attention of Jeworski Mallett at the Department of
12  Corrections.
13      A.   Yes, I did that.
14      Q.   Was there somebody at VitalCore that you came
15  to similarly complain about those particular kinds of
16  complaints?
17      A.   Like I said, we went through a real big
18  change of our chain of command.  You know, there were
19  times we didn't have one but for a few days.  We
20  had -- I don't -- like I said, I don't know which
21  point we're at right here, but we had a change to
22  Ms. Lampkin was taken out of the picture.
23      Q.   Right.
24      A.   She was removed.  And then Mr. Paxton Page
25  took her place as an HSA, and at that time, we didn't

Page 75

1  have but -- obviously, I mean, for during the ice
2  week, I was the only nurse that showed up, period, for
3  the LPN.  I worked the whole week with Paxton Page
4  and, like I said, I know Mr. Mallett came down and I
5  was the only one that showed up for work that week.  I
6  worked the entire prison with Mr. Page to make sure
7  every area of that prison had medication before I left
8  that day, and I worked with him like that because
9  there was no one.  I was left with every bit of the
10  720 by myself, any other area.  I stepped in and, you
11  know, I helped them.  I did my job.
12          And then around that time, we had Nurse -- we
13  had a new nurse.  She just showed up that day.  Nobody
14  even told me, because we didn't have -- there was not
15  a lot of people working there.  Nurse Holloway showed
16  up one day, and she come to the room, and she told me
17  who she was, and that she had been brought there by
18  Dr. Singh, Singh maybe.  Dr. Singh?
19      Q.   Singh?
20      A.   Uh-huh.  And she had worked with him and he
21  had asked her to come work there.  And she is a black
22  female, just to be known of the situation, but I
23  trained -- we worked great together.  It was
24  wonderful.  We had a great work relationship at that
25  time, and we were having new staff come in, but -- so

Page 76

1  during that change, like I said, I don't know which
2  area we're in because it -- but during that change,
3  whenever I got a raise that week because I showed up
4  as the only one and the providers told -- called
5  Mr. Mallett in there -- and at this time, we're
6  talking to the -- Mr. Mallett, and I know Kathy Hogue
7  was in the picture at some point.  I know -- I don't
8  know at what point Nurse Davis comes in as the new
9  HSA.
10      Q.   Right.
11      A.   So like I say, all I'm saying is who's -- you
12  know, Paxton Page is still here for a little while,
13  because, see, he was already there, and I go back to
14  work one day, he's not there.  We have a new person
15  here.  So it's all kind of chaotic, you know, just
16  from thinking about it without looking at my documents
17  here.
18      Q.   Right.  Yeah, I understand.
19      A.   So but Mr. Mallett and Ms. Hogue were very
20  well aware of the workload I was under and --
21      Q.   Okay.
22      A.   -- as well as Nurse Holloway.  And so she was
23  aware.  And at some point, they get Nurse Othello
24  comes in.  He's new there.  And from the very first
25  day he walks in the change, he comes down to 720 to

Page 77

1  orientate with me and Nurse Holloway, he lets it be
2  known right up front, you know, that he does not like
3  me and it's a -- he told me it was a culture issue.
4  You know, I didn't understand what they were talking
5  about with him and Nurse Holloway.  So all this, you
6  know, kind of started sometime in the change.
7      Q.   Was Othello -- Othello wasn't an HSA, was he?
8      A.   No, he was -- he was an LPN.  He had come --
9  so he started as an LPN.  Now, somewhere along the
10  line, he gets moved up.
11      Q.   Okay.
12      A.   We have -- I don't want to say we have --
13  it starts with the change with that, and then we go
14  into -- now, I don't know who comes along next, if
15  it's Nurse Davis.  I know at some point Nurse Davis.
16      Q.   I know there was Page, Paxton Page, that came
17  after Lampkin.
18      A.   Right.
19      Q.   And I think Davis came after Page.
20      A.   Okay.  And, well, then there was a DON we
21  called -- I don't even remember his name.  He lasted a
22  day.  Then we had Nurse Cross come in.  I think he
23  started as an RN, but at some point, he goes to a
24  higher position.  We have Nurse Naylor comes in at
25  some picture.  We have Nurse Brown comes in at some

LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC
Lisa Crawford on 05/21/2024

Page 78

1 point, becomes the supervisor.  For a minute, we
2 didn't have any help, any steady supervision.
3     Q.   Okay.
4     A.   You know, we were just kind of left to -- the
5 ones who were there, I guess we just did our job and
6 tried to keep everything going.  But, you know, I did
7 have, you know, the e-mail communications, you know,
8 with Ms. Hogue and Mr. Mallett about the workload that
9 I was under and --
10    Q.   Does the name Diamonisha Brown sounds
11 familiar?
12    A.   Nurse Brown, I think was Alita Brown.  I'm
13 not positive.  We didn't go by first names, just to --
14    Q.   Sure.  I know.
15    A.   Due to the prison setting, we --
16    Q.   Yeah, you didn't want to get too familiar,
17 right.
18    A.   We all went by last names, which was very
19 important because, if the offenders found out your
20 first name, they, you know, they did come out to --
21 they have ways of getting out into the real -- we call
22 it the free world and contacting you.
23    Q.   Yeah, yeah, yeah.  I understand.  I
24 understand.
25    A.   As far as -- there were Browns, but I don't

Page 79

1 know which one without looking at her right at this
2 moment.
3     Q.   Well, the reason I mention that name is
4 because I think that would have been the person that
5 was at VitalCore that you specifically filed a
6 grievance with.  Does that sound familiar?
7     A.   We had -- what was her name?  I know I did
8 talk to someone from VitalCore, but as far as her
9 first name goes, I do not know at this moment, but it
10 is documented.
11    Q.   Okay.
12    A.   Because I had a supervisor Brown, as well.
13    Q.   When you say "supervisor," was this another
14 nurse?
15    A.   Yes, sir.
16    Q.   Kind of like Ms. Bessie?
17    A.   Right.  They kept trying to get -- med distro
18 is a very heavy area of work, very important area.
19    Q.   Well, you've got to deal with all the
20 offenders and --
21    A.   Right.  We see them --
22    Q.   -- coordinate with --
23    A.   We're with them all day long as far as -- if
24 you're in the clinic, you're with certain people at a
25 time.  So -- and it's not just 720.  You have to

Page 80

1 praise all the nurses because we really do, no matter
2 what area we're in, you have to really be dedicated to
3 really take care of that many people.
4     Q.   Right.
5     A.   So I'm not sure about the Diamonisha name at
6 this moment.
7     Q.   Okay.  So the EEOC charge was then amended in
8 2021, but from your perspective, the things that you
9 complained on or complained of were continuous at that
10 time.  In other words, they were still going on even
11 though you had filed the complaint?
12    A.   Oh, yes, sir.
13    Q.   Okay.
14    A.   They were still going on.
15    Q.   Were there any other incidents or racial
16 incidents that stood out in your mind that happened
17 subsequent to your filing the complaint in 2021, or
18 amended complaint in 2021?
19    A.   In 2021, I believe that Nurse Brown came in
20 and Nurse Davis.  Nurse Brown made it very clear, too,
21 as well, that -- she actually did end up at some point
22 moving me because she ended up treating me very
23 harshly as far as even making me take orders from
24 CMAs, and she let me know up front, I mean, our very
25 first meeting with her.

Page 81

1     Nurse Holloway and I, once again, we went to
2 meet her.  We went to RNC to meet her.  We went in and
3 sat and talked with her, you know, let her know, you
4 know, we knew that respecting there would be -- every
5 supervisor is free to, you know, to be themselves and
6 do what they do, but we had expressed to her, you
7 know, that we worked well together, and when they
8 called us to the areas together, we could handle them,
9 because we had -- Nurse Holloway and I had worked for
10 a period without supervision.  It was directly -- even
11 Ms. Hogue had to come.  She came and worked 720
12 because we didn't have help there.  I worked with many
13 different -- even people from different departments
14 that were, you know, that worked in intake or RNC or
15 RNs because there was -- we were so shorthanded at
16 this point.
17     But when we went in to meet, whatever time
18 frame she came in early on with Nurse Brown, we went
19 to meet her and find out what our new schedule was,
20 because there was no schedule posted where it normally
21 is.  You know, we talked for a little bit.  I don't
22 remember the full conversation, but when we -- she
23 said that -- she said, "Nurse Holloway, you know, if
24 you want to stay on, you know, you'll be stationed at
25 720."

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
**Lisa Crawford on 05/21/2024**

Page 82

1     And she said, "Nurse Crawford, you're going
2 to be moved to" -- I'm not sure if it was the yard or
3 quick bed, but it was in the female area.
4     And I didn't say anything, but Nurse Holloway
5 told her, she said, "No," she said, "Crawford's been
6 here longer than me.  She can stay at 720 and I'll
7 move."
8     And, you know, I told her, "No, you don't
9 have to do that.  If that's the point, I'll move."
10     So we left out of there not -- we didn't know
11 what the schedule was going to be.  She had not made
12 the final decision at the moment, I don't believe.
13 But, you know, we went out of there to -- with Nurse
14 Holloway knowing, you know, that that was pure
15 discrimination.  That was our words to each other,
16 and --
17     Q.   So in terms of schedule then that you were
18 subjected to from the time the change was made until
19 the time you weren't working there anymore, did that
20 schedule stay the same?
21     A.   No, sir.
22     Q.   How did it change?
23     A.   Nurse Brown started moving me around
24 everywhere.  I mean, at one point, I didn't have even
25 have -- I was on a golf cart all day going around to

Page 83

1 every area just giving insulin, which that's almost
2 impossible because you have to -- you don't know what
3 -- if I go down to -- say I went down to quick bed,
4 they're just like a little closet, is the medicine
5 room.  They do not have any supplies, because we don't
6 have -- so I -- it's very hard to get from point A to
7 point B out here if there's no golf cart.  If there's
8 no -- if they haven't fixed the golf carts, they
9 haven't provided rides.  So I'm having to walk in all
10 this, snow, these conditions, or driving, you know,
11 whatever conditions.  I'm basically on a golf cart all
12 day going from building to building, giving insulin
13 and not having proper supplies there, having to --
14 trying to get supplies is a hassle and -- on itself,
15 and then on top of it, you have to work sometimes at
16 the officer's mercy and, if they don't have an
17 officer, you have to wait for them.  So it was a
18 really hard situation she put me in.  It was a very
19 undue stress.
20     Q.   Okay.
21     A.   So, yeah, it did change, and I was all over
22 the place, you know, for a little period of time
23 there, so ...
24     Q.   And in terms of the supervisor who was
25 putting you in those positions, was it just that one

Page 84

1 person or was it additional supervisors who also kind
2 of kept that up?
3     A.   They kept it up.  You know, I did get to go
4 back to 720 at some point, but it was always at either
5 an added building to 720, it becomes 720 and F, or 720
6 and the yard, or -- you know, at times, you know, it
7 just kept -- unnecessary additional stuff kept going
8 on after that.
9     Q.   Who was the supervisor that brought you back
10 to 720?
11     A.   I do not know at the moment.  I do know in my
12 notes because, like I said, we had -- even in
13 between -- I don't know if it was between Nurse Brown
14 and the new supervisor.  We had Nurse Michaels took
15 over for a couple of days or a week.  I don't even
16 know how long she was in there.  She might have been
17 the one.  I don't know.  There was so much change of
18 supervisors there at that little point, but I know I
19 wrote on the report for Nurse Brown specifically.  And
20 then -- but I don't know if it was her or Nurse Davis
21 that put me back.  I really don't.
22     Q.   Okay.
23     A.   We had -- we had a different assistant HSA
24 for a few days.  I don't know if he was a part at the
25 time.  He didn't stay long enough.  I doubt he was.  I

Page 85

1 think it was Mr. Bradley maybe.
2     Q.   Okay.
3     A.   And then we had -- so I'm not sure which one
4 moved me back at this point, so I don't -- because
5 Nurse Othello becomes supervisor somewhere right after
6 Nurse Brown, and I don't even know why Nurse Brown's
7 not there anymore.  So I don't know which one put me
8 back.
9     Q.   Okay.  At some point then, you made the
10 decision that you were going to resign?
11     A.   (Witness nods head up and down.)
12     Q.   What prompted you to reach that conclusion?
13     A.   That was the hardest day of my life, if you
14 want the truth, of my working career.  I had never --
15 I had wanted to -- because, you know, it was my right
16 to work, no matter where I'm at, and I loved, like I
17 said, I loved my job -- but for -- at the end had
18 become so horrible.
19     I had several incidents at the end, from '22
20 to the end of '22, but just at the end, since you
21 asked me specifically why I resigned, there was a CMA,
22 Ms. Rogers.  She had -- she had verbally attacked me.
23 She had threatened to physically attack me.  She had
24 harassed me.  She had done deliberate things.  I had
25 written her up.  I had reported her.  I had reported

LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC
Lisa Crawford on 05/21/2024

Page 86

1  her -- her and Nurse Othello together were
2  absolutely -- I had it -- at some point, it got so bad
3  that I had to call, you know, the headquarters.
4  Ms. Hogue was made aware of Mr. Rogers, as well as
5  human resources, very wonderful lady there.  They
6  assured me she would get -- after that, she would
7  never do that again, her threats and everything, all
8  the reports that are written on her.
9        Well, towards the end, around -- at some
10  point we're working together around Christmastime,
11  November, Christmastime, January, somewhere in there.
12  There's several incidents I'm skipping over because --
13  so you can kind of get an understanding of why I
14  resigned.
15    Q.   Yeah, that's fine.
16    A.   She had -- we had worked together, and she
17  wasn't supposed to even be around me, but she came --
18  she had came to work that day and we had worked -- we
19  were working together and, at some point -- I mean,
20  she wouldn't -- she didn't even want me to speak in
21  the room.  That's impossible.  I'm a nurse.  She comes
22  at me in the middle of -- I'm at the insulin cart now
23  because she's -- she's not even a nurse.  She's a
24  medical assistant, a CMA.
25    Q.   Okay.

Page 87

1    A.   So she's on the medication side and I'm
2  trying to give insulin, which we have three clear
3  bottles of insulin on the cart.  I'm having to watch
4  them -- I have to give an offender a needle.  These
5  men can take that needle and run, they can stab each
6  other, they can, you know, do whatever they want if
7  there's no officer there.
8    Q.   Right.
9    A.   And trust me, we're skipping a lot, but they
10  know how to take needles.  That's a big deal.  And so
11  you have to watch that so closely.  You have to watch
12  them take their insulin with all the chaos going on
13  and document at the same time, reading the doctor's
14  orders, making sure their glucose is stable, making
15  sure there's nobody over here.  So it's a very intense
16  process.
17        And I have Ms. Rogers literally come at --
18  she coming away from her cart, and I leave from my
19  cart, and at the same -- I don't know if it's the same
20  time to go another bottle of insulin.  At some point
21  from there to there, she's coming at me or, when I
22  come back in, she comes at me so close that I can
23  physically feel her.  I have insulin in my hand and
24  I'm back like this because she's over me with her
25  hands in fists at her side, the heat, I mean, just her

Page 88

1  face, her nostrils, telling me what she was going to
2  do to me, daring me to hit her back, push her.  She
3  wanted me to.  And on top of that, I'm trying to give
4  insulin.  Okay?  At the same time, she's trying to
5  harm me.
6        Well, you know, she's sitting there doing
7  that.  I'm not going to hit her.  I'm not there for
8  that.  So I told her to hit me or get off of me.  She
9  got off of me.  Now, this is after she's been
10  reported.  I left out of there and I went straight to
11  Mr. Eubanks, and I'm not sure if Nurse Riley was there
12  at the time and Nurse Lee.  They told me they would
13  move her.
14    Q.   You mentioned the HSA.
15    A.   Yes.  At this time he is, yes, sir.
16    Q.   He was HSA.  Okay.
17    A.   And Nurse Lee is now -- I believe he's the
18  supervisor now, and there's Nurse Riley there, and
19  then there's Nurse Davis.  They're all aware of her
20  actions against me.  And I told them she put her body
21  on me, and I could have -- I believe I could have
22  pressed charges on her.  I don't even know.  I was
23  just -- at this time, I had been through so much with
24  her, she had done -- she had security.  The security,
25  they had done some -- I wrote all of that up.

Page 89

1        But let me just stick to the point of why I
2  resigned was the last day I was there, Ms. -- me and
3  Ms. Dew at this time, Ms. Dew is working with me
4  regularly, CMA, we're there and we're preparing for
5  the weekend.  She comes there and she's not supposed
6  to be there.  But she comes there with a group of her
7  girls into that room, and we've already changed --
8  they have actually changed the whole prison system
9  around.  They moved the whole women, all of women to
10  720, and all the men over to the other side of the
11  prison.  So I have a whole -- there's way many more
12  women here.  I have a whole new ball game going on.
13  I'm having to learn their issues, listen to them,
14  learn their ways of -- so that was extremely
15  challenging by itself, and I'm confident I could have
16  done it, but whenever she comes there that -- I'm not
17  sure exact day.  She comes there with those group of
18  girls, she comes in the room and makes it known she's
19  there, starts talking.
20    Q.   This is Rogers you mean?
21    A.   Yes, sir.  Letting us now she's going to be
22  there this weekend, telling Ms. Dew orders, because
23  she wouldn't speak directly to me, but she wanted me
24  to hear it, because I'm actually the one in charge
25  there.

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
**Lisa Crawford on 05/21/2024**

Page 90

1    Q.    What was Rogers position?
2    A.    CMA.
3    Q.    She's a certified medical assistant?
4    A.    Yes, sir.
5    Q.    Okay.
6    A.    But she would not -- if I would have spoken,
7    which I have tried, you know, to stand firm with
8    myself without disrespect, I knew there was going to
9    be conflict, so I didn't say anything.
10   Q.    Who did she report to?
11   A.    She had the same supervision as me.  We
12   were -- she worked in med distro.  At some point,
13   VitalCore took out a lot -- instead of two LPNs, they
14   brought in some CMAs.
15   Q.    Right.  Okay.
16   A.    So I have now had to deligate because it was
17   a whole new process.  I had people under me.
18   Q.    Right.
19   A.    And she was under me, which made it so
20   challenging because she would not let me -- even allow
21   me to speak.  And then while I spoke, she made fun of
22   me, my voice.  She called -- I mean, she called me
23   some names.  Like I said, she'd already threatened me.
24   She wasn't supposed to be there that day.  When she
25   came in there and she was saying that, my body started

Page 91

1    pouring out sweat while I'm trying to give -- I'm
2    holding a needle, trying to give insulin.  Their
3    officers are short.  These women are just pissed off
4    that they're -- they don't want to be over there.  I'm
5    having to listen to that so the -- it was so intense
6    that I started pouring out sweat.  My body is just
7    pouring.  My hair is soaking wet, trying to hold my
8    composure and keep my eyes on the insulin and the
9    needles and the ladies, and her in my ear basically.
10   And when we left that night, me and Ms. Dew, you know,
11   we were like, it's going to be all weekend with her.
12   You know, she made it clear.
13          Well, that night when I went home, I was
14   laying in sweat.  My body couldn't take it no more.
15   And I was so under pressure, I was like, I can't give
16   those women insulin and safely administer insulin to
17   these patients and keep my composure and I'm pouring
18   out sweat.  I was just -- my body was absolutely
19   traumatized, I guess.  That's what later came.
20          So I knew I couldn't do it anymore.  My
21   health was at stake here, and I could not go through
22   another weekend with her.  I couldn't.  So it was the
23   hardest thing I ever had to do, was to leave there,
24   because I loved it, you know, and it could have worked
25   out if she had just done her job, if they had just

Page 92

1    stayed away from me.  I never did anything back to
2    her.
3    Q.    You're talking about Rogers now?
4    A.    At this point, Ms. Rogers.  It's just --
5    well, it's all of it together.
6    Q.    Yeah, yeah.  I understand.
7    A.    But this specific day, you know, she was
8    there and my body couldn't take it no more.  I knew I
9    couldn't risk my license, you know, and I didn't want
10   to -- I never want to kill somebody.  I'm a nurse.  So
11   I had to resign from there, you know, because the
12   environment was so hostile with the -- I couldn't do
13   it.  My body couldn't function.  Somebody was going to
14   get hurt or I was going to lose my license.  And so,
15   you know, I resigned.
16          And for about -- shortly after that, I was
17   diagnosed with PTSD from it, you know.  And so that's
18   why I resigned, though.  It had become so much, the
19   officers, the -- Nurse Othello had done a lot of
20   things in between here at the end.  They had the
21   officers on me so bad.  They actually had inmates, him
22   and Ms. Rogers had inmates making vicious rumors about
23   me.  The K-9 forces would be there watching my line so
24   intently, you know, and they're -- this is -- it's a
25   very serious issues and -- to the point, so all this

Page 93

1    is going on, too, as well, with Ms. Rogers.
2    Q.    Right.
3    A.    I'm getting left out of Christmas meetings.
4    I mean, like, at the Christmas -- I resigned in the
5    first of February, but at the Christmas party, you
6    know, and it all started just piling up so bad, you
7    know.  It was just, like, at the Christmas party, they
8    harassed me, wouldn't even let me bring in my
9    Christmas gifts.  Mr. Othello, which I have a -- the
10   e-mail where I have had a conversation with the chief
11   CID officer because I knew, you know, I said something
12   was going on and it was my -- it was Nurse Othello had
13   been working with the inmates, getting them to cause
14   trouble, trying try to cause, you know, if you -- if
15   the inmates ran their mouth and the CID got -- because
16   there's so much contraband going on there.
17   Q.    Sure.
18   A.    All that's going on, all the corruption going
19   on.  So they get word of that and make it look evident
20   because Ms. Rogers had messed with my needles.  She
21   had -- I had went back to work and had needles
22   missing, and I had -- all that was going to end up
23   going on my record at the Mississippi State Board of
24   Nursing.
25   Q.    Gotcha.

LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC
Lisa Crawford on 05/21/2024

Page 94

1     A.   They're -- if you get punished and you get
2  put in the back of that magazine, you know, that's on
3  my mind.  I value my license here.  They've got the
4  officers on me so heavily, they've got -- they're
5  so -- won't even let me bring in a Christmas gift.
6  Mr. Eubanks came up there at Christmas.  I got the
7  gifts in.  There -- there was a $35 minimum, you know,
8  as far as the gift goes.
9     Q.   Right.
10    A.   And if you didn't get a gift of that same
11 nature, whoever gave you a gift that was wrong would
12 be taken away and given back to them.  Well, I was
13 given a Christmas gift that it had three dollar boxes
14 of candy from, like, the Dollar General or Dollar
15 Tree.  I didn't say anything.  Ms. Dew said,
16 "Crawford, you need to show them that."  I said, no, I
17 can't take it anymore, you know, I can't take -- they
18 were aware of it.  So it was getting done that way at
19 the Christmas party.
20         And then here comes January, you know, and I
21 also have the -- an e-mail where I sent the chief CID
22 officer where I had to actually go to him and find
23 out, hey, these officers are on me like this, these
24 inmates are telling me this, this, and this.  If
25 there's something wrong, I need to know, you know.

Page 95

1  And it comes out that he said give me the names of the
2  inmates that are saying these things and your boss'
3  phone number, Nurse Othello.  And so I did that, and
4  they did remove those inmates that were causing those
5  rumors, he did, the CID.
6     Q.   Okay.
7     A.   And so -- but that's all together right there
8  with Ms. Rogers coming in, you know, and doing what
9  she did.
10    Q.   Okay.
11    A.   And I just -- my body couldn't take it
12 anymore.
13    Q.   I know you referenced a couple of times that
14 you had e-mails or notes or anything like that.
15    A.   Uh-huh.
16    Q.   Could you give those to your lawyer to
17 produce to us?
18    A.   Yes, sir.
19    Q.   Because it may be something, you know, that's
20 there that might be relevant.  I suspect that a lot of
21 the things -- did you maintain copies of charges or
22 the complaints that you filed with Centurion or
23 VitalCore?  Did you keep those copies?
24    A.   I have -- I have all the -- well, I mean,
25 like I said, Nurse Othello was my authority that I

Page 96

1  reported to first and I'd already reported to
2  Ms. Hogue about -- and Dr. Fawcett about what he was
3  -- how Nurse Othello had retaliated against me and
4  added one -- he had added a whole new facility, the
5  yard to me and 720.
6     Q.   Okay.
7     A.   And I had already told him that.  So
8  everything I'm saying is already documented.
9     Q.   So those things would have already been, from
10 your perspective, already been documented in some kind
11 of way?
12    A.   Oh, yes, sir.
13    Q.   Whether it was written or at least, you know,
14 orally advised to somebody at VitalCore?
15    A.   Yes, sir.
16    Q.   Okay.  In terms of the posttraumatic stress
17 disorder you described, had you ever had any problems
18 with PTSD prior these incidents?
19    A.   No, sir.  I was diagnosed with PTSD within a
20 week or two after I resigned.
21    Q.   Okay.
22    A.   It was after I resigned soon.  I'm not sure
23 the exact date.
24    Q.   Have you seen -- had you seen any other kind
25 of medical professional for anything like anxiety or

Page 97

1  panic attacks or anything prior to your resignation?
2     A.   Yes, sir.  I had started seeing Dr. William
3  Johnson at Region 8 after -- sometime in '20, I
4  believe.
5     Q.   Okay.
6     A.   After it had gotten, you know, to the point
7  to where I was coming home crying at night because of
8  the stuff that wouldn't -- was going on at work, you
9  know, and I didn't -- I'm a nurse, you know.  It's
10 my -- I'm a new nurse, really.  You know, my career is
11 just starting.  I don't want to -- so I had to go --
12 you know, I went to Region 8 to Dr. William Johnson
13 and he -- he was great, wonderful, helped me stay
14 strong, and I did go there, and -- for anxiety and
15 stress.  But I did not have PTSD, you know.  It was
16 treatable, what I had, and so -- but at the end, after
17 I resigned, when I went there, I was diagnosed with
18 PTSD.
19    Q.   Okay.  How did the treatment or the -- rather
20 the symptoms that you were exhibiting for, like,
21 stress and anxiety, how did that differ from what you
22 experienced when you were diagnosed with PTSD?
23    A.   Well, my body, like I said, those sweats were
24 from the stress and my fight or flight syndrome.  My
25 body had been so traumatized by seeing all that, seen

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
**Lisa Crawford on 05/21/2024**

Page 98

1 and been through, that it didn't know anymore when to
2 stop.  I was constantly looking over my shoulder, even
3 though I'm not at work.  I had started trembling.
4 That was the -- that's the worse one for me.  I'm
5 right-handed, and that's my dominant arm, and whenever
6 it -- they would come on, the triggers and the PTSD
7 attacks, you know, my arm would start trembling and I
8 couldn't control it.  Even now, I'm -- my processing
9 is slow.
10      As far as, you know, even it messed with me
11 like that and I had those triggers, and I don't know
12 what was going on, but it was the -- I started having
13 the flashbacks, nightmares, and like I say, when I was
14 diagnosed with that, I'm like, you know, I didn't know
15 how it would be different, either, you know.
16      Okay.  Well, you know, it's just going to --
17 I knew the veterans had it.  You know, I've had a
18 little bit of training there as far as nursing school,
19 but I've never dealt with anyone that had it, and I'm
20 like I don't understand what PTSD is, but when it hit
21 me, I knew something was wrong, you know, and I
22 started having those, like I said, those symptoms I
23 explained to you, and I knew, oh, my gosh, you know,
24 PTSD is very real.
25      It had really -- it has really been an

Page 99

1 experience, is all I can say, that I will forever
2 be -- you know, respect to our veterans, because now I
3 know, when I look back, that I was in a war zone.  I
4 was absolutely in a war zone, you know, with all
5 this -- the stuff I saw, with --
6      **Q.   I was just about to ask you, what makes you**
7 **describe the work environment as a war zone?**
8      A.   It became so hostile, you know, and then,
9 like, on top of that, I saw inmates die for no reason.
10 I saw the fights.  I saw young boys come up and just
11 cut their arms up with razors, pouring out blood.  I
12 had to go in and find a dead man and do CPR on him,
13 you know, because he wasn't allowed out of the doors
14 in time to get to the -- and I wasn't even -- the
15 officer wouldn't even go in there.  I did.  They
16 wouldn't even come out of the tower.  So I had to deal
17 with things like that, which I know would have been
18 okay if I didn't have to have all this other excess
19 from my own people going on here, but --
20      **Q.   To be fair, a lot of that stuff that you're**
21 **describing would have gone on whether or not, you**
22 **know, you had issues with, you know, some of your**
23 **supervisors or co-workers or whatever because that was**
24 **the environment that you were working in.**
25      A.   Right.  And I had did fine with that, you

Page 100

1 know.  I've already seen all that, a lot of that,
2 prior to the change.  You know, I had already seen a
3 lot what was involved in being a nurse there in the
4 prison setting.  And I handled it very well, you know,
5 in my -- from my point of view.
6      **Q.   Right.**
7      A.   But it was the -- when my own, you know, my
8 own co-workers and then the different officers, the
9 discrimination going on, all of it piled together,
10 when I look back, it's literally like I feel like I
11 was in a war, you know.
12      **Q.   That feeling -- I'm sorry.  Go ahead.**
13      A.   I was there in the face of COVID, when COVID
14 hit.
15      **Q.   It's like you're reading my mind, because I**
16 **was about to ask you about that.**
17      A.   And that was absolutely horrific because we
18 had to go through -- we had to come up with an
19 emergency plan to move inmates to the separation when
20 they had -- we had to literally go push our carts down
21 to the buildings and give inmates, in the hallway,
22 medications or through a drawer.  We had -- it was the
23 biggest challenge, you know, that I've ever been
24 through as far as nursing, you know, watching the --
25 but we did it and it was fine if you -- as long as you

Page 101

1 had -- the times that I had a co-worker that was -- we
2 worked together professionally, we did things like
3 that with no problems.
4      But when, you know, the harassment comes and
5 then the devious stuff going on behind the scenes, you
6 know, that's too much for me to handle.  I can't -- I
7 didn't realize, you know, that it was doing my body
8 that way, you know.  When I started sweats and
9 trembled so, that's when I see.  When I look back at
10 all of it put together, I feel like I was a nurse that
11 went to war and came home.
12      **Q.   Yeah.  When we talk about some of the impacts**
13 **of the posttraumatic stress disorder, did anyone at**
14 **Region 8 or any of the specific doctors say**
15 **specifically that, yes, you know, I attribute this**
16 **PTSD in part to at least the discrimination or the**
17 **treatment that you alleged you received?**
18      A.   I have -- I was assigned a special PTSD
19 therapist as well as my normal doctor, Dr. Johnson,
20 and then Natalie Moody took over for him eventually.
21      **Q.   Right.**
22      A.   But my -- Cody Evitas -- I'm not really sure
23 how -- I'm not really sure, because I call him Cody.
24      **Q.   Right.**
25      A.   He's a therapist and he has been amazing.

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
**Lisa Crawford on 05/21/2024**

1  I'm telling you, he has -- he's trained to know what's
2  going on.
3      Q.   Right.
4      A.   And he helped me stay straight, and he's
5  really helped me save my life, really.  So he knows
6  that the -- what happened there was so intense for me,
7  he said, you know, even one -- even if just one of
8  those things had happened was enough to throw
9  somebody.
10     Q.   Yeah.  That's what I was just about to ask
11  you.  And I know, you know, even though you're a
12  nurse, you may not have had it expressed to you that
13  way, but did Cody or Dr. Johnson, have they ever said
14  that, you know, the PTSD was a combination of issues
15  with the lockdowns and COVID, plus the fact that you
16  were in a prison setting, plus the fact of the
17  allegations about the discrimination or the
18  harassment, did they ever put it to you that way, or
19  do you have any understanding on how they might
20  perceive that?
21     A.   I mean, you know, they haven't just come out
22  and said those words like that, but they know that it
23  was the stress from work, not the job itself that was
24  causing these symptoms in me.  Like, even high blood
25  pressure, my doctor knew that when I would have to

1  leave because Nurse Othello, like, one time he made me
2  pick up the cotton balls, he nitpicked me about that,
3  and it -- my blood pressure went -- it's documented,
4  the blood pressure was so high, I went to -- there was
5  -- the doctor didn't have -- there was nothing he
6  could do because it's the stress causing that, because
7  it's okay without that.
8          So I went to Region 8 to see the therapy, the
9  therapist, Jasmine.  She knows.  When I told her what
10  happened, she said that's not your fault, he did that.
11  That's work.  And she deescalated me, and my blood
12  pressure came down.
13         So I believe, you know, they know that very
14  clearly.  Cody, my therapist, knows very well what
15  caused it because he had to explain to me why I had it
16  or what's going on with it, what, you know -- or
17  mainly explaining to me that I have the -- how PTSD
18  works, you know, and that I will be okay, because it
19  was so intense for me, I mean, I basically completely
20  have lost control at one time of my whole, like, my
21  right side, you know, when I -- I've had to have
22  surgery, as well, in between all of this.
23         So I mean, it's been very added traumatizing
24  me not to be able to function even.  I didn't know if
25  my body was going to be okay because it was so bad,

1  but I've come a long way, so ...
2      Q.   And you mentioned the surgery that you had.
3  Is that the surgery -- what kind of surgery was that?
4      A.   I had to have a rotator cuff repair surgery
5  and torn muscle, and I'm not sure what the -- it was
6  -- he had to shave some bone.  I don't know what that
7  was medically called.
8      Q.   Right.  Yeah.
9      A.   And there had been some bursitis in there, as
10  well.
11     Q.   One of the things that your lawyer provided
12  to us in the course of the case was a listing of some
13  of your medical providers.
14     A.   Uh-huh.
15     Q.   Dr. Ramsey at Sports Medicine and Fitness
16  Flex Rehab.  That treatment was for your shoulder
17  injury; right?
18     A.   Dr. Ramsey is the treatment for my shoulder
19  injury.  I did go to the physical therapy at Fitness
20  Flex, but I also have, through the -- my body was
21  so -- from the -- the PTSD actually causes you to have
22  physical symptoms.  My body was so wore out and tired,
23  but as they worked out the arm part, you know, to get
24  relief there, I started having pain down my leg into
25  my knee.  So I went and had that checked out, which it

1  turns out it was not my knee, that it was my hip, my
2  right hip.  But that's still in -- because I couldn't
3  go do an MRI because I couldn't lay on my back because
4  of the surgery.  You have to be able to lay for 45
5  minutes, so it's kind of complicated right now as to
6  what actually, you know, is the -- I'm still a work in
7  progress.  I haven't had the MRI yet.
8      Q.   Yeah.
9      A.   I'm in the process of doing that, but I know
10  that it's an effect -- whatever it is, my leg has been
11  affected.
12     Q.   Okay.
13     A.   Whatever the root of it is, we don't know
14  yet.
15     Q.   Okay.  From --
16     A.   But I have been to therapy for it, as well.
17  I'm sorry.
18     Q.   From your perspective, are you alleging that
19  any of the issues with your shoulder or your leg, are
20  you alleging that that's related to the allegations
21  about retaliation and discrimination?
22     A.   Well, they did not provide me a proper ride
23  to -- proper transportation to be able to get from RNC
24  to 720, you know, my work.  That was their place to
25  provide me a way to get there, and they did not, and I

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
**Lisa Crawford on 05/21/2024**

Page 106

1 had to, you know, you ride with the van that I got
2 into with the MDOC workers.
3     Q.   Is that -- was that movement that you're
4 describing, was that related to the change that we
5 discussed earlier, the change in your schedule?
6     A.   It was.  And it was also the change
7 in MDOC.  Or I don't know who made that change.
8     Q.   Okay.
9     A.   Let me say that.  Someone made a change where
10 we had to park at RNC, not at 720, which is a
11 considerably long way to walk by yourself in the dark
12 with inmates walking around freely, no officer.
13     Q.   Right.  So you --
14     A.   So I couldn't -- sorry.  So they were --
15 VitalCore was supposed to provide golf carts.
16     Q.   Okay.
17     A.   And they did, but if someone didn't charge
18 them -- and there was sabotage of the golf carts.
19 They -- that was known.  There was not one that day,
20 there that day that worked or available, is all I can
21 say.  So in the -- I had to take a ride with --
22 because it was in December, so it was very cold
23 outside.
24          And once again, we had to carry a backpack,
25 clear backpack, with enough food and water to last

Page 107

1 you.  Our shifts were 12 hours, but we had to be there
2 longer, plus we could not leave to go to our vehicle
3 or leave the facility.  So we were, like, on complete
4 lockdown once we got there.  So I had a considerable
5 amount of water bottles to carry, and food for my --
6 you know, to stay through the day because, if you ran
7 out of water, in which I have, it's horrific out there
8 with no water and you can't leave, and you're not
9 leaving.  If you leave, you're not coming back to
10 work.
11          So I had a heavy backpack, is what I'm trying
12 to say, and I couldn't walk that far with -- there was
13 no officer to -- they were shorthanded.  It was me and
14 my co-worker, Ms. Dew.  So we had to make a choice,
15 you know.  The officer's there, he has another female
16 officer in the van.  They offered us a ride to 720,
17 so, you know, that's where -- when I got into the van,
18 I had that backpack on, which I'm shorter than most,
19 and then when I stepped up to that van on that side, I
20 reached up to grab the side bar, but I guess they have
21 Plexiglass, like, because they had to have dividers in
22 there if they have inmates in there, which I couldn't
23 see it.  It was dark because it was early, 5:15, 5:30
24 in the morning.  So whatever time -- it stuck in my
25 hand and I fell just straight back out of the van, so

Page 108

1 that's --
2     Q.   At that time, that wasn't -- that was a
3 Department of Corrections van you're describing?
4     A.   It didn't have -- it was a Department of
5 Corrections worker.  I don't know whose van it was.
6 There was a female officer that -- in there, as well,
7 that he took to the yard that morning.
8     Q.   Okay.  So that incident -- when did that
9 incident, that particular incident, occur; do you
10 remember?
11     A.   In December, I believe, of '21.
12     Q.   Okay.  Did you have to have any kind of
13 emergent medical treatment following that incident?
14     A.   I requested to get -- to be able to go to the
15 doctor.  I asked for that because I didn't -- like I
16 say, I didn't have -- Nurse Othello is my chain of
17 command.  I let him know what had happened.  I wrote
18 him an incident report and he told me he would get
19 back with me on letting me know.  He never did let me
20 leave my post that day to leave, but nothing was
21 broken on me.  I knew that much.  So, you know, I
22 stayed at my post because, if I left my post, I could
23 have been charged with abandonment of care, if he
24 wanted to do that.
25     Q.   Sure, yeah.

Page 109

1     A.   With all that was going on with him, I was
2 not taking a chance.  So he didn't provide for me to
3 have relief of duty, so I stayed that day, but I wrote
4 up the report so -- and he never got back with me and
5 told me about -- so I could go get, you know, at least
6 checked to see if -- I didn't feel anything broken.
7     Q.   Okay.
8     A.   But I have written there my shoulder was
9 sore, I did fall completely onto this right side and
10 roll over.  It's kind of a down -- it was quite a
11 fall.  But I was glad nothing was broken at the
12 moment.  I literally got COVID, like, a few weeks
13 after that, within the next month.  So, you know, he
14 never got back with me about medical treatment.
15          I continued to carry the backpack, but I was
16 -- it was so sore.  I carried a rolling cart at times
17 to pull the backpack, put it was such a hassle with
18 security.  They didn't want that.  And then also we
19 had to go out of a back dock off of RNC which had
20 stairs, a stairway to get down.  So pulling the cart
21 actually even turned out to be a real hassle.  So, you
22 know, I -- sometimes I had to just carry the backpack
23 continually, and I -- like I said, I thought that it
24 was just a sore muscle from the backpack after the
25 fall.

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
**Lisa Crawford on 05/21/2024**

Page 110

1    Q.   And the backpack was -- I'm sorry.
2    A.   Like, later on, it continued to be sore, you
3  know, after that.  And when I stopped carrying the
4  backpack after I resigned, you know, I noticed that my
5  arm still felt kind of heavy, like I was, you know, it
6  was sore, but I had the PTSD going on at the same time
7  and my whole body was going crazy, really, so I
8  thought it was just tense.
9         So I got -- you know, I went to a massage
10  therapist.  I thought maybe that would work it out.
11  It didn't.  It continued to get where I couldn't sleep
12  at night or turn over and, you know, I was very
13  scared, to be honest with you, because I have PTSD on
14  top of now an arm possibly, there's something going on
15  in there.  And sure enough, it got lined up when I
16  went to the Mississippi Sports Medicine emergency
17  room.
18         You know, they did an x-ray and immediately
19  put in to see Dr. Ramsey, and they put me through
20  physical therapy.  They gave me a shot in my shoulder
21  and he said to do physical therapy.  Well, it didn't
22  get better.  It just kept getting worse.  So he did an
23  MRI, and that's when he found that I needed to have
24  surgery.
25    Q.   You had the rotator cuff thing?

Page 111

1    A.   Yes, sir.
2    Q.   The backpack that you were using, was that,
3  like, with medical supplies and things that you needed
4  to go from different areas at the facility?
5    A.   It was -- the backpack was our personal
6  backpack.
7    Q.   Okay.
8    A.   We had to carry our things in a clear
9  backpack to work at the facility.
10    Q.   I understand.  Okay.  I just wasn't sure
11  whether or not the backpack that you were carrying
12  around was you were carrying it because it was
13  containing medical supplies.  But that's your personal
14  stuff that you had to take with you whenever you were
15  moving around the facility?
16    A.   Right.  But we did have to carry medical
17  supplies at times, you know, and I was responsible for
18  getting medical supplies for 720.  So I did pick up
19  things there, too, you know.  But the backpack is the
20  main thing that I carried on my arm.  That backpack
21  was -- after the fall, you know, became excruciating.
22    Q.   What all did you have that you had to carry
23  around?
24    A.   Like I said, we had to have enough water and
25  food because, at this time, we could not leave to go

Page 112

1  to our car.  We had to be in 720.  The drink machines
2  did not work, if there were, in the clinic.  So we had
3  to carry enough water, food, and whatever personal
4  items, medication, that we had to have to get through
5  the day.
6    Q.   Okay.  So what's been your status since you
7  resigned from VitalCore?  Have you had any employment
8  since then?
9    A.   No, sir.
10    Q.   Okay.  And is that because -- why haven't you
11  had employment, is a better question.
12    A.   I haven't been able to focus to even get a
13  job, you know, or even think about that, tying to
14  recover from the PTSD and the rotator cuff repair.
15    Q.   Okay.  From your perspective then, it was --
16  the reason that you haven't been able to get or look
17  for other work is related to the medical issues you've
18  been having?
19    A.   Yes, sir.
20    Q.   Okay.  I know you're married.  Is your
21  husband taking up the load for income that you would
22  have been making for the family?
23    A.   He has.  I exhausted my savings and he has --
24  he's trying to do his best, I guess, but he hasn't
25  been able to keep up with it, so -- but he has what --

Page 113

1  I'm in survival mode, so it has been a --
2    Q.   Have you made an application for unemployment
3  benefits or Social Security disability?
4    A.   Yes, sir.  I did try to apply for Social
5  Security disability.  I was denied because of my
6  husband's income.  But the woman knew that I was --
7  whomever I talked to, she called me back because she
8  knew that I was being sincere and I didn't have any --
9  though he had income, I had no income, and I had no --
10  what he had was just what he could.
11    Q.   Right.
12    A.   And so he wasn't able to give me any income.
13  Well, she called me back and said that she would look
14  into trying to get -- seeing if I -- because I didn't
15  have enough for myself because you had to work five
16  years.  So they were trying to see, her and her
17  supervisor, if they could get enough credits from what
18  little I did work in the first of '23 'til February to
19  see if it would help, but I haven't heard anything
20  back about that.
21    Q.   Okay.  What about any kind of workers'
22  compensation benefits?  Are you receiving those?
23    A.   No, sir.
24    Q.   Okay.  But you're getting medical care.
25  That's being taken care of by workers' comp?

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
**Lisa Crawford on 05/21/2024**

Page 114

1    A.   No, sir.
2    Q.   Who's --
3    A.   My husband's insurance is paying for those.
4    Q.   I'm sorry.  Your husband's insurance?
5    A.   Yes, sir.
6    Q.   Okay.  Do you have an open workers'
7  compensation claim?
8    A.   I have -- I went to a deposition.
9    Q.   Okay.  But at least until this point, you
10  haven't received any medical benefits or any
11  employment benefits from workers' comp itself?
12   A.   No, sir.
13   Q.   Okay.  Let me go back a little bit, fill in
14  in a few blanks, just going back to the anxiety that
15  you were experiencing and the posttraumatic stress
16  disorder.  Prior to the treatment that you've been
17  receiving since you resigned, I know you mentioned
18  that you had initially seen, I think it was,
19  Dr. Johnson --
20   A.   Yes, sir.
21   Q.   -- starting in 2020?
22   A.   Sometime around there.
23   Q.   Was there something specific that triggered
24  your seeing Dr. Johnson back in 2020?
25   A.   Well, yes, there was.  It was work-related

Page 115

1  when I went there, but I would have to look and see.
2  Well, actually, it was an overall, because my --
3  Dr. Fleming is my general practitioner.
4    Q.   That's your regular doctor, right.  Yeah.
5    A.   Yes, sir.  And he had helped me as much as he
6  could as far as it goes with anxiety and depression.
7  He's been my doctor for a long time, my main doctor.
8  So I knew I needed to see a professional that dealt
9  with -- specifically with -- because I don't want to
10  be on a whole lot of medications and he knows that.  I
11  I want to try to beat this.  I want to try to get off
12  this, all anxiety and depression.  You know, I didn't
13  have to have that prior, so I don't want this, any of
14  that now.  So that's why I went to Dr. -- Region 8
15  with Dr. William Johnson.
16   Q.   Dr. Johnson.  Okay.  And in terms of the
17  treatment that Dr. Fleming was giving you for stress
18  or related kinds of issues, was that -- where did that
19  derive from, to your understanding?
20   A.   Work.
21   Q.   That was all work-related, as well?
22   A.   Well, I mean, I had -- you know, I have
23  everyday normal ...
24   Q.   Sure, I understand.
25   A.   I had a family, you know.  I had two boys,

Page 116

1  you know.  They're graduated now, but --
2    Q.   A husband and kids are stress inducing for
3  anybody.
4    A.   Right.  And, you know, we -- we're a close
5  family, so, you know, we're -- I'm a hands-on mom, you
6  know.  I'm very involved.  So I mean, I can -- that
7  was just normal life, but whenever the work stress
8  came in on it, you know, it just became too much for
9  me.
10   Q.   So it was really what you were experiencing
11  at CMCF that led you to go from whatever management
12  Dr. Fleming was providing to really seeking out help
13  from a specialist like Dr. Johnson?
14   A.   Well, I mean, as far as, you know, who it
15  came from, you know, just CMCF or whatever, but, yes,
16  I went there work-related.
17   Q.   Gotcha.  Gotcha.  Okay.  And you're still
18  seeing Dr. Johnson?
19   A.   No, sir.  He is still -- Natalie Moody took
20  his place.
21   Q.   Okay.  So it's still Region 8, but it's a
22  different provider?
23   A.   Yes, sir.
24   Q.   Okay.  All right.  But you're still seeing
25  Natalie?

Page 117

1    A.   Yes, sir.
2    Q.   She's a physician, as well?
3    A.   She took William's place, Dr. William
4  Johnson.
5    Q.   What I'm saying, she's a doctor, too, or is
6  she a therapist?
7    A.   Well, she's my doctor.  She prescribes my
8  medication, and Cody is my therapist.
9    Q.   Okay.  Got it.  All right.  Ms. Crawford,
10  have you ever had any other kind of legal lawsuit?
11  Have you ever been involved in any other lawsuit
12  before?
13   A.   No, sir.
14   Q.   Okay.  And you understand in this case the
15  Department of Corrections and CMCF, they're not
16  defendants in the case anymore.  Do you understand
17  that?
18   A.   I really -- I really can't answer that one.
19   Q.   Okay.  Is there anything else that we haven't
20  discussed about your claim that you want to bring up
21  while we're here in terms of, you know, what you think
22  was related to the actions taken against you or
23  anybody specifically that you wanted to discuss about
24  your claim that was related to it?  I know we talked
25  about -- initially we talked about Franklin and Bass

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
**Lisa Crawford on 05/21/2024**

Page 118

1 and Jenkins, and then it moved on to talk about some
2 of the nurses that came along later, Rogers, that kind
3 of thing. Are there any other names that specifically
4 you think were problematic that caused you issues?
5    A.   I'd have to think about that one because
6 that's quite a few years going on there.
7    Q.   I understand. Like I said, it's not a test.
8 I'm just -- since I've got you here, I wanted to ask
9 you about anything that was specific that, in your
10 mind, is, you know, relevant to the claims that you're
11 making about the harassment or retaliation or
12 discrimination specifically.
13    A.   Well, Nurse Othello, he -- he had put a
14 meeting together one time which he caught -- he told
15 me in front of Ms. Dew that he just wanted to talk, he
16 was going to have a little chat with me, you know, but
17 we thought that was rather odd. And he said, meet me
18 in my office the next day, and when I went there, he
19 had put -- he had -- I walked into his office and
20 there was Nurse Davis, I believe Nurse Naylor, and
21 Dr. William Brazier was in there, as well.
22    Q.   Okay.
23    A.   And so I was kind of thrown off by that by that.
24 You know, I didn't know what was going on because, you
25 know, like I said, Dr. William Brazier, I've worked

Page 119

1 with him from the very beginning. You know, he was
2 the doctor.
3    Q.   He's the medical director there?
4    A.   He was, yes, sir.
5    Q.   Okay. Okay.
6    A.   And so when I got called into the office
7 for -- when Nurse Othello -- I wasn't really sure
8 why I got called in there because he told me he was
9 going to have a little chat with me, but they were all
10 there, and he had had a series of questions asking me,
11 kind of making allegations even towards me, something
12 I couldn't even answer for because I knew I didn't
13 have any involvement in it. And Dr. Brazier was just
14 listening. It went on quite a while.
15        And then Dr. Brazier had to step out for a
16 medical emergency and, when he had stepped out, you
17 know, Nurse Davis had told me, you know -- she hit the
18 table and she said, you know, "That's it. You know,
19 you're going to do what he says. This is your
20 supervisor now," you know.
21        But still, I don't even know why I'm there.
22 Well, he -- I just said, "Yes, ma'am." You know, I
23 didn't say anything back because I knew it was what it
24 was.
25        And then Dr. Brazier came back into the

Page 120

1 meeting and he asked me, well, he asked me is
2 everything okay or whatever, and they all said they
3 were getting up to leave. And he said, "Nurse
4 Crawford, is everything okay with you?"
5        And I let him know, I said, "well, I was told
6 I would do what they say and, you know, that was it."
7        And so he went no. You know, he had told
8 them, he said this has got -- he said, "Nurse Crawford
9 has been here. She's, you know, been a faithful
10 nurse." I've worked with him. He stood in for me
11 that day and I didn't get, you know, reprimanded or
12 whatever Nurse Othello had intention of.
13        And everyone left the office after he spoke,
14 and I did stay with Dr. Brazier after that and --
15 because I was, you know, in tears. I was just so
16 grateful that someone had -- you know, did stand in
17 for me that day, you know. And so whatever -- I don't
18 know what his intentions were for that meeting, but it
19 did seem that it was not a good thing going on there.
20 Honestly, I thought I was being set up to be fired or
21 reprimanded on my record.
22        But after that, you know, he did -- the dates
23 of the things he started after that, you know, it was
24 retaliation-wise to me, you know, and I thought that
25 was -- that was a big moment for me. That really --

Page 121

1 it really embarrassed me, my character, my work ethic,
2 everything, and put me on the spot like that and, like
3 I said, in front of my peers and co-workers. So I
4 would just like to add that.
5    Q.   Okay. Dr. Brazier, he was the medical
6 director when Centurion was in charge, too?
7    A.   He was there through Centurion and VitalCore.
8    Q.   Do you know if he's still there now?
9    A.   I believe he recently passed away.
10    Q.   Okay.
11    A.   I believe so.
12    Q.   All right, Ms. Crawford. I don't have any
13 further questions for you at this time. Your lawyer
14 may have some for you.
15    A.   Okay.
16    MR. NORRIS:  I have no follow-up. Thank you.
17    MR. NORTHINGTON:  Okay. Thank you for you
18 time.
19        (Whereupon the deposition was concluded at
20 12:44 p.m., the same day.)
21
22
23
24
25

**LISA CRAWFORD vs VITALCORE HEALTH STRATEGIES, LLC**
Lisa Crawford on 05/21/2024

**Page 122**

```
 1              CERTIFICATE OF COURT REPORTER
 2         I, Catherine M. White, CSR, and Notary Public
 3   in and for the County of Rankin, State of Mississippi,
 4   hereby certify that the foregoing pages, and including
 5   this page, contain a true and correct transcript of
 6   the testimony of the witness, as taken by me at the
 7   time and place heretofore stated, and later reduced to
 8   typewritten form by computer-aided transcription under
 9   my supervision and to the best of my skill and
10   ability.
11         I further certify that I placed the witness
12   under oath to truthfully answer the questions in this
13   matter under the power vested in me by the State of
14   Mississippi.  I further certify that I am not in the
15   employ of or related to any counsel or party in this
16   matter, and have no interest, monetary or otherwise,
17   in the final outcome of the proceedings.
18         Witness my signature and seal this the 6th
19   day of June, 2024.
20   _____
21             CATHERINE M. WHITE, CSR No. 1309
22   My Commission Expires:
     February 1, 2026
23
24
25
```

**Page 123**

```
 1              DEPONENT'S CERTIFICATE
 2         I, Lisa Crawford, the deponent in the
 3   foregoing deposition, certify that I have read the
 4   foregoing pages 4 - 121, being the total number of
 5   pages relating to my testimony, as to the correctness
 6   thereof, and that after reading said pages and subject
 7   to any corrections I may have reflected below, I
 8   certify that this testimony is true, correct and
 9   complete and that the transcript thereof is true and
10   correct.
11         _____
                       Lisa Crawford
12
     STATE OF _____
13   COUNTY OF _____
14         SWORN TO AND SUBSCRIBED before me on this the
15   _____ day of _____, 20___.
16
17         _____
                       NOTARY PUBLIC
18   My Commission expires: _____
19   PAGE | LINE | CORRECTION      | REASON
            |      |                 |
20   _____|_____|_____|_____
            |      |                 |
21   _____|_____|_____|_____
            |      |                 |
22   _____|_____|_____|_____
            |      |                 |
23   _____|_____|_____|_____
            |      |                 |
24   _____|_____|_____|_____
            |      |                 |
25   _____|_____|_____|_____
```